UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------x

ESTATE OF JAYTHAN KENDRICK,                    :

                            Plaintiff,         :          **AMENDED COMPLAINT**

             - against -                      :          No. 23-cv-358 (NGG) (TAM)

THE CITY OF NEW YORK, THE NEW       :
YORK CITY HOUSING AUTHORITY,                  Jury Trial Demanded
LORI ANN FEE, JOHN ORLANDO, BRIAN   :
DUBECKY, THOMAS DEUTSCH,
RICHARD DEFILIPPIS, JAMES                     :
MAGUIRE, and JOHN REYNOLDS, in their
individual and official capacities,           :

                       Defendants.       :

---------------------------------------------------------x

Plaintiff, ESTATE OF JAYTHAN KENDRICK, by its attorneys, the LAW

OFFICES OF JOEL B. RUDIN, P.C., the LAW OFFICE OF THOMAS HOFFMAN, P.C.,

and BLOCH & WHITE LLP, respectfully alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

1.     This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, and New York

State law, seeking monetary damages for the late Jaythan Kendrick's unlawful criminal

prosecution and conviction in Queens, New York, in 1995 for a murder he did not commit,

and for his horrendous imprisonment lasting more than 26 years.

2.     Prior to his arrest, Mr. Kendrick was a disabled military veteran with no prior

criminal record or history of violence.

3.     His conviction was overturned in 2020, following an extensive review by the Queens County District Attorney's Office's Conviction Integrity Unit, the Innocence Project, and a team of *pro bono* lawyers.

4.     In granting the parties' joint motion to vacate Mr. Kendrick's conviction, a New York State Supreme Court Justice described Mr. Kendrick's conviction and decades-long incarceration as a "monumental" "miscarriage of justice" and a "travesty."  He made an "apology" on behalf of the court which he acknowledged "comes decades too late."

5.     The corrupt tactics used to convict Mr. Kendrick included pressuring 10- and 18-year-old boys to falsely accuse him, planting evidence in his apartment, preparing false or misleading police reports, witness statements, and other evidence, presenting or failing to correct false or misleading testimony at trial, suppressing evidence favorable to the defendant, and other misconduct.

6.     Such tactics occurred with impunity in the 1980s and 1990s at the New York City Police Department ("NYPD"), the New York City Housing Authority Police Department ("HAPD"), and the Queens County District Attorney's Office ("QCDAO"), leading to numerous wrongful convictions.

7.     The toleration of such misconduct by policymaking officials encouraged its repetition and led directly to the miscarriage of justice that occurred in this case.

8.     Mr. Kendrick tragically passed away a little over a year after his release from prison.  His estate brings this civil action on his behalf against the individual police detectives who collaborated in framing him and against the City of New York and the New

York City Housing Authority for their unlawful policies and practices which also contributed to causing his injuries.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

9. This action arises under 42 U.S.C. §§ 1983 and 1988 and under the common law of the State of New York.

10. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 and under the principles of pendent jurisdiction.

11. Venue is proper under 28 U.S.C. § 1391.

12. This action has been commenced within the applicable period for each claim.

13. On or about February 3, 2021, Mr. Kendrick served the City of New York and the New York City Housing Authority ("NYCHA") timely notice of the present claims, in accordance with N.Y. Gen. Mun. Law § 50-e.

14. On June 8 and June 9, 2021, hearings were conducted, in accordance with N.Y. Gen. Mun. Law § 50-h, by the City and NYCHA, respectively.

15. Plaintiff and Mr. Kendrick have duly complied with all conditions precedent to the commencement of this action.

## THE PARTIES

16. Plaintiff ESTATE OF JAYTHAN KENDRICK is a resident of the State of Georgia. The co-executors of his Estate, with the authority to bring this Action, are Clarence Hughes, Jaythan Kendrick's cousin, who worked tirelessly for years to help Mr. Kendrick fight his conviction, and Regions Bank of Atlanta, Georgia. At all times material

3

to this Complaint, Jaythan Kendrick was a resident of the State of New York within the Eastern District of New York.

17.     Defendant LORI ANN FEE was at all relevant times an assistant district attorney in the Queens D.A.'s Office and an employee of the City of New York, acting within the scope of her authority and under color of state law. She is named here in her individual and official capacities.

18.     Defendant JOHN ORLANDO was at all relevant times an assistant district attorney in the Queens D.A.'s Office and an employee of the City of New York, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

19.     Defendant BRIAN DUBECKY, shield no. 1424, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

20.     Defendant JOHN REYNOLDS, shield no. 757, was at all relevant times a detective employed by NYCHA, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

21.     Defendant RICHARD DEFILIPPIS, shield no. 813, was at all relevant times a detective employed by NYCHA, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

22.     Defendant THOMAS DEUTSCH, shield no. 859, was at all relevant times a detective employed by NYCHA, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

23.    Defendant JAMES MAGUIRE was at all relevant times a detective-lieutenant employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

24.    Defendant CITY OF NEW YORK ("City") is a municipal corporation of the State of New York and is a resident of the Eastern District of New York.

25.    Defendant NYCHA is a municipal corporation of the State of New York and is a resident of the Eastern District of New York

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### I.    The Homicide of Josephine Sanchez and the Arrest of Mr. Kendrick

26.    At approximately 3:30 p.m. on November 30, 1994, Josephine Sanchez, 70 years of age, was stabbed to death during an apparent robbery.  In a struggle over her purse, the assailant stabbed her twice, through her overcoat, with the fatal wound being into her back.

27.    Ms. Sanchez's body was found on a pathway between 21-51 35th Avenue and 34-34 24th Street at the NYCHA's Ravenswood Housing Development in Astoria, Queens.

28.    Several eyewitnesses subsequently interviewed by the police described the assailant as a Black male wearing a white jacket who "ran" from the scene with the victim's purse in a westerly direction, towards a park area and 35th Avenue.

29.    Consistent with the assailant's observed westerly escape path, police recovered the apparent murder weapon—a single scissor blade with fresh blood on it—approximately 150 feet to the west of the crime scene behind 21-51 35th Avenue.

30.     Mr. Kendrick resided in the Ravenswood Housing Development at 23-02 34th Avenue, to the east of where Ms. Sanchez's body was found.

31.     Because the murder occurred on property owned by NYCHA, the HAPD, together with the NYPD, conducted a joint investigation.

32.     HAPD and NYPD recruits were all trained at the New York City Police Academy, frequently worked together on investigations, and followed similar protocols, customs, and procedures in investigating homicides and other felony complaints.

33.     The assigned detectives in charge of the investigation were Defendants Thomas Deutsch, an NYPD detective, and John Reynolds, a HAPD detective.

34.     During the investigation, Detectives Deutsch and Reynolds and their respective teams frequently worked together and shared all relevant information.

35.     NYPD Officer Steven Gutmann was the first police officer to arrive at the scene of the Sanchez murder.

36.     Officer Gutmann interviewed a key eyewitness, Brandon Rogers, who was 10 years old at the time, immediately after the incident.

37.     Rogers told Officer Gutmann that he heard a woman's screams about 3:30 p.m. and then looked out from his third-floor window at 34-34 24th Street.

38.     Rogers said he saw a man struggling with the woman and seemingly punching her before running off with her purse.

39.     Rogers described the assailant as a male black, 25 to 30 years of age, over 6 feet tall, 190 pounds, wearing blue jeans, a white jacket, and a green army cap.

40.     Rogers provided no description of the man's face.

41.     Rogers was at least 100 feet away and from that distance could not see clearly the features of the person's face.

42.     Indeed, police knew a second eyewitness who lived one floor below Rogers in the same building told Defendant Deutsch that she could not describe or identify the assailant because he was too far away.

43.     A couple of hours after Officer Gutman's initial interview of Rogers, Rogers was interviewed at a NYCHA police office by Defendants Dubecky and Reynolds.

44.     In their contemporaneous notes of that interview, Defendants Dubecky and Reynolds recorded Rogers' statement that the man who committed the attack was a male black, 30 years old, wearing a mustache, white low-cut sneakers, no socks, blue sweatpants, a white jacket, a green army camouflage hat, looked "dirty," and fled westbound holding a pocketbook.

45.     Rogers did not otherwise describe the perpetrator's face.

46.     After the interview of Rogers at the NYCHA office, police broadcast over the radio that the man "possibly" had a mustache and was a "crack head," which prompted another officer to radio back:  "That describes everyone in the projects."

47.     Defendant Dubecky's DD5 omitted the description of height and weight that Rogers previously had given to the police, that Rogers initially had said nothing about facial hair, and that Rogers initially said the man was only 25 to 30 years of age.

48.     Defendant Dubecky's DD5 had a space for the detective to fill in the report number, in sequential order, but the number was left blank and was only filled in, at some later point, by hand.

7

49.     Other witnesses interviewed by the detectives uniformly corroborated Rogers' statement that the man had run west towards 35th Avenue.

50.     Shortly after Rogers was interviewed, Det. Gary Whitaker, along with Detectives Mercado and Estrada, conducted a canvass of 21-15 35th Avenue.

51.     As part of that canvas, the Detectives interviewed a resident named Mario Aguilo.

52.     Aguilo, 18 years of age, told Whitaker that he was walking past the front of 35-35 24th Street when he saw the victim lying on the ground, apparently not breathing, with blood on the floor next to her.

53.     In fact, Ms. Sanchez had been found in an entirely different location, 34-34 24th Street, which is all the way across 35th Avenue from the location specified by Aguilo.

54.     Further, Aguilo's claim that he saw blood as he walked by the victim was directly inconsistent with other witness accounts that said there was no blood visible in the immediate aftermath of the assault.

55.     Detective Whitaker confirmed that "Mr. Aguilo could offer no further information."

56.     Shortly thereafter, six hours after the homicide, Defendants Deutsch and Reynolds saw Mr. Kendrick standing at the corner of 34th Avenue and 24th Street.

57.     Mr. Kendrick lived nearby, at 23-02 34th Avenue.

58.     Mr. Kendrick was wearing an off-color, yellowish waist length coat – not a white coat – which had a red spot on it.

59.     Mr. Kendrick did not fit most of the elements of Rogers' initial description: he was 5'7", not over 6"; he was wearing dark shoes, not sneakers; he was wearing black pants, not blue ones; his jacket was off white or yellowish, not white; and he was 36, not 25-30.

60.     The detectives asked Mr. Kendrick whether he knew anything about the murder of Ms. Sanchez, and Mr. Kendrick truthfully responded that he knew nothing about it.

61.     Nevertheless, Detectives Deutsch and Reynolds chose to view Mr. Kendrick as a suspect.

62.     Mr. Kendrick then agreed to go voluntarily with the detectives to the precinct in response to their request that he assist them in investigating the crime.

63.     At the 114th Precinct, Mr. Kendrick told Detectives Deutsch and Reynolds, among other things, that he was on disability both from the United States Army and from the United States Postal Service, where he had worked for many years, and that he received regular disability payments.

64.     The detectives knew at the time that eyewitnesses had consistently reported that the perpetrator had run quickly from the scene (and had run in a westerly direction, away from the direction of Mr. Kendrick's home).

65.     After learning that Mr. Kendrick had disabilities, the detectives made no inquiry to determine whether Mr. Kendrick could have possibly run from the crime scene in the manner the witnesses had described.

9

66.     In fact, due to his various physical issues, Mr. Kendrick could not have run from the crime scene in the manner the witnesses had described.

67.     At the precinct, Detective Deutsch asked Mr. Kendrick to explain the red spot on his coat and Mr. Kendrick truthfully explained that it was lip stick.

68.     Officer Gutmann had observed that the 70-year-old victim had not been wearing rouge, makeup, or lipstick, and so it obviously wasn't hers.

69.     Mr. Kendrick was cooperative throughout his interaction with the detectives.

70.     He provided consent for the officers to search his apartment at 23-02 34th Avenue.

71.     Later that night, at approximately 12:30 a.m. on December 1, Mr. Kendrick accompanied Defendants Deutsch, Reynolds, and Dubecky to his home.

72.     A female subtenant of Mr. Kendrick's was present when the officers and Mr. Kendrick arrived.

73.     At the detectives' request, Mr. Kendrick retrieved and handed them his sneakers, which included two pairs of white high-tops.

74.     These sneakers did not fit Rogers' description of low-cut sneakers.

75.     They had no blood on them.

76.     The detectives took the two pairs of shoes anyway, with Mr. Kendrick's consent, for testing.

77.     The officers found a pocketbook in a dresser drawer in a bedroom.

78.     Mr. Kendrick explained that the pocketbook belonged to his estranged wife.

79.     For this reason, Mr. Kendrick asked the detectives not to take it and they did not.

80.     The only other item of clothing in Mr. Kendrick's apartment that was of interest to the police was a camouflage-type cap.

81.     The officers took the cap even though it had no blood on it and Mr. Kendrick said it belonged to a friend.

82.     The officers did not find any low-cut white sneakers, blue jeans, blue sweatpants, or white jacket (other than the tan or yellowish jacket Mr. Kendrick was wearing).

83.     Trying to find any clothing or contraband that might link Mr. Kendrick to the crime, the detectives subsequently searched the garbage compactor in Mr. Kendrick's building, nearby sewers, and area laundromats and dry cleaners, but came up with nothing of interest.

84.     Defendant Deutsch interrogated Mr. Kendrick again at 2 a.m. on December 1, after which Mr. Kendrick remained in police custody for the rest of the night.

85.     The following morning, at approximately 9 a.m. on December 1, police learned that Mr. Kendrick had an outstanding warrant for a misdemeanor drug possession charge.

86.     The detectives placed Mr. Kendrick under arrest to answer that warrant.

87.     At this point, the police were legally obligated to take Mr. Kendrick to court forthwith to answer the warrant and for appointment of legal counsel.

88. In particular, if the police wanted to detain Mr. Kendrick further in relation to the investigation of the Sanchez murder, and to have him participate in a lineup, they would have to establish probable cause, obtain a court order, and notify his counsel to be present.

89. Instead, using the aforementioned misdemeanor drug possession warrant as a pretext, the police continued to detain Mr. Kendrick at the 114th Precinct, unaccompanied by counsel, while they conducted further investigation of the Sanchez murder.

90. Defendants Deutsch and Dubecky interrogated Mr. Kendrick off and on for 11 hours using physical coercion and racial epithets.

91. Meanwhile, to cover up the illegal nature of their detention and interrogation of Mr. Kendrick at the precinct, Defendant Deutsch prepared a DD5 which falsely reported that, following the arrest on the warrant, Mr. Kendrick was "transported to Queens Central Booking where he was lodged."

## II.   The Lineup

92. During the evening of December 1, Defendant Dubecky transported 10-year-old Brandon Rogers, along with his mother, to the 114th precinct to view a lineup containing Mr. Kendrick.

93. Prior to the lineup, Defendant Dubecky improperly told Rogers that the man who had committed the murder would be in the lineup.

94. Defendant Dubecky's unlawful statement that the assailant would be in the lineup encouraged Rogers, a 10 year old, to select whoever in the lineup most resembled

the man he had seen from more than 100 feet away, as opposed to someone he truly recognized as the perpetrator.

95.     The lineup was conducted by Defendants Deutsch and Lt. Det. James Maguire, Deutsch's supervisor.

96.     The lineup was also conducted under the supervision of Defendant Lori Ann Fee, a QCDAO assistant district attorney acting in an investigatory capacity.

97.     It was Defendant Fee's responsibility to ensure that the lineup was not conducted in an unduly suggestive or otherwise unlawful manner and to intervene if it was.

98.     When Rogers initially viewed the six-person lineup, he did not recognize anyone's face, having seen the incident from 100 feet away.

99.     Rogers then requested that each lineup participant stand and step forward.

100.    Rogers then identified the individual in position No. 6, one of the fillers, as the assailant.

101.    Rogers told the detectives that the individual in position No. 6 "looks like the guy who stabbed the lady."

102.    According to a Lineup Report prepared by Defendant Deutsch, Mr. Kendrick was 5'8" tall at the time of the lineup (other police reports listed him as 5'7") and weighed 170 pounds.

103.    The individual in position No. 6, to the contrary, was 6'3" and 173 pounds.

104.    In other words, the person in the lineup whom Rogers said most resembled the killer looked drastically different than Mr. Kendrick.

105.    Defendants Deutsch and Dubecky, aided by Defendant Fee, then unlawfully and unfairly influenced Rogers to identify Mr. Kendrick.

106.    Defendants Deutsch, Dubecky, and Fee showed Rogers and his mother a Lineup Report Deutsch had prepared which identified the individual in position No. 3, Mr. Kendrick, as the "Subject."

107.    Moreover, in a section of the Lineup Report entitled "Subject/Defendant," Deutsch identified the "subject" as "Kendrick, Jay," and even listed his address (23-02 34th Avenue, Queens).

108.    Thus, by viewing the detectives' Lineup Report, Rogers and his mother learned that the individual in position No. 3, Mr. Kendrick, was the police suspect and lived close to them and the location of the murder.

109.    After showing them the Lineup Report, Defendants Deutsch, Dubecky, and Fee then took Rogers and his mother into a separate room to talk things over.

110.    In that room, Defendant Dubecky told Rogers' mother, in Rogers' presence, that Rogers had selected the wrong man.

111.    Dubecky further discussed with Rogers' mother, out loud and still in the presence of Rogers, that the police suspect was the individual in position No. 3.

112.    After overhearing that discussion, Rogers then said, "it is No. 3, isn't it?"

113.    Rogers then stated that the individual in position No. 3 had been his "second choice."

14

114.   Rogers explained to the detectives that the killer was tall like his father and that he had initially identified the individual in position No. 6 because he was tall whereas the individual in position No. 3 was too short.

115.   Rogers further explained that the individual in position No. 6 had been wearing white shoes, which matched his previous description, whereas Mr. Kendrick was wearing dark shoes.

116.   Pursuant to police rules and practice, detectives are required to memorialize in a DD5 everything relevant that happens concerning an identification procedure that isn't already stated in the Lineup Report.

117.   However, Defendant Deutsch prepared a DD5 which falsely claimed that Rogers had spontaneously stated, "it was three," whereas in fact he had initially identified No. 6, a filler, and was led to No. 3 as his "second" choice only as a result of the detectives' improper suggestions.

118.   Defendant Deutsch omitted crucial details from his DD5, including:

a.   Dubecky's improper statement to Rogers that the killer would be in the lineup;

b.   Rogers' statement that the individual in position No. 6 most closely resembled the perpetrator;

c.   Rogers's statement that the killer was 6'1" or 6'2" and resembled the height of his father;

d.   That Rogers and his mother had been directed to review and sign the Lineup Report, which indicated that the police subject was the individual in position No. 3, and that this occurred *before* Rogers made a statement "identifying" the individual in position No. 3;

e.      That Dubecky had told Rogers' mother that her son had selected the wrong man and that the killer was the individual in position No. 3 and that Rogers apparently had overheard this statement;

f.      That Rogers initially had been unable to recognize anyone from the participants' faces and had asked for each individual to stand up and walk towards the window;

g.      That the detectives then followed this procedure; and

h.      That it took Rogers approximately three minutes to make his initial selection of the individual in position No. 6 and then additional time in the separate room before making his statement about the individual in position No. 3.

119.    Following the lineup, the defendants knew that Rogers' "identification" was worthless, that in fact his description did not fit Mr. Kendrick, and that they lacked probable cause to initiate a prosecution of Mr. Kendrick for the robbery/murder.

## III.    <u>The Second Interview of Mario Aguilo</u>

120.    On December 4, 1994, Defendants Reynolds and DeFilippis brought Mario Aguilo to the 114th Precinct for further questioning.

121.    As alleged above (¶¶ 51-55), the detectives had spoken with Aguilo the night of the murder and he had been able to provide no useful information.

122.    However, the detectives knew that Aguilo was vulnerable to police pressure: he was just 18 years of age, was on probation for robbery, and was a habitual drug user.

123.    The detectives showed Aguilo, who knew Kendrick as "Jay," a single photograph of Mr. Kendrick, making clear that Mr. Kendrick was the subject of their investigation.

124.    Urged on by the detectives, who now had their sights myopically focused on Mr. Kendrick, Aguilo suddenly came up with an entirely new story.

125.    Aguilo now claimed that, before seeing the victim on the ground, he saw Mr. Kendrick running "very fast" and into Mr. Kendrick's own apartment building while carrying a woman's dark purse.

126.    Writing up this interview in a DD5, the detectives omitted any mention of his prior contradictory statement, that Aguilo was on probation for robbery, and that he was known to be a heavy drug user.

127.    The detectives also omitted that Rogers and other eyewitnesses had seen the perpetrator run, not towards or into Mr. Kendrick's building to the east, but in the other direction, towards 35th Avenue to the west, that other witnesses who had been the first to discover the victim's body had not seen Aguilo there at all, and that Mr. Kendrick was disabled.

128.    Further, Aguilo claimed he had been with his girlfriend, Jennifer Park, at 34-20 24th Street, and was leaving that building when he saw Mr. Kendrick run by, but the detectives apparently never bothered to verify that story with Ms. Park.

129.    Had they done so, the detectives would have learned that Ms. Park, as her school records showed, was at school that day, and that Aguilo's story was a fabrication.

130.    The detectives then wrote out for Aguilo a description of the perpetrator's clothing that was designed to match what Mr. Kendrick was wearing when they took him into custody the day of the crime.

131.    That description included that the perpetrator was wearing a "dirty" white jacket, brown pants, and black or brown shoes.

17

132.   That description, however, was not consistent with the descriptions provided by the actual eyewitnesses as to what the assailant was wearing as he attacked Sanchez.

133.   In particular, the actual eyewitnesses had described the killer as wearing white sneakers, not dark shoes; blue, not brown, pants; and a white, not a "dirty" white, jacket.

## IV.   **The Second Search of Mr. Kendrick's Apartment**

134.   Armed with the highly unreliable lineup identification of Mr. Kendrick and Aguilo's new (and false) statement, Defendant Deutsch swore out an affidavit to obtain a search warrant for Mr. Kendrick's apartment.

135.   Defendant Deutsch's search warrant affidavit was false or misleading in numerous material respects, including the following:

a.   The affidavit relied on Rogers' description of the assailant without revealing that he had identified a filler at a lineup;

b.   The affidavit failed to reveal Rogers' statement that the reason he identified the filler was that the assailant was tall like his father, approximately 6'2" tall, whereas Mr. Kendrick was 5'7";

c.   The affidavit cited Rogers' description that the black male assailant was "in his thirties" and Mr. Kendrick was 35, without revealing Rogers' original statement that the assailant was 25 to 30;

d.   The affidavit stated that Rogers said the assailant wasn't wearing socks and that Mr. Kendrick was stopped without socks, without revealing that Rogers said the man was wearing white sneakers whereas Mr. Kendrick was wearing dark shoes;

e.   The affidavit alleged a second witness, Mario Aguilo, claimed he saw Mr. Kendrick running into Mr. Kendrick's building while carrying a woman's pocketbook, without revealing that Aguilo's original statement was that he had seen nothing of the sort;

18

  f. The affidavit claimed Aguilo had seen the man wearing "shoes" and no socks, which matched Mr. Kendrick's appearance when police stopped him six hours later, without revealing Rogers' statement that the actual perpetrator was wearing white sneakers;

  g. The affidavit failed to reveal that Rogers had said the man ran in the opposite direction than Aguilo said; and

  h. The affidavit failed to reveal that Aguilo was on probation for a violent robbery, was a habitual drug user, and had been pressured by police to change his story.

136. The affidavit alleged that, when conducting the earlier consent search of Mr. Kendrick's apartment, the police had seen a black pocketbook in a bedroom dresser drawer.

137. The affidavit requested, and obtained, the court's permission to search for and seize the pocketbook, other personal effects of Ms. Sanchez, the other half of the single scissor blade apparently used in her stabbing, and other forensic evidence, including "blood, hair, fibers, latent and patent finger prints …"

138. The search was conducted by Defendants Deutsch, Dubecky, Reynolds, Maguire, and others.

139. Following it, these detectives falsely claimed, and documented in a Property Clerk's Invoice and in a photograph, that they had recovered a black pocketbook in plain view on top of a television.

140. During their previous search, the defendants had only found a purse in a dresser drawer; they had seen no purse in plain view on top of a television.

141. Mr. Kendrick had been in police custody since the initial search.

142. He could not possibly have left a pocketbook on the television.  The pocketbook was planted by the defendants.

143.   Later, the detectives showed the pocketbook to numerous individuals who knew or had seen Ms. Sanchez but could not persuade any of them to identify it as hers.

144.   They did not disclose this to the defense.

145.   The purse became important evidence at trial that Mr. Kendrick had robbed the elderly lady.

146.   Not until 26 years later did the D.A.'s Office finally admit, after DNA testing, that the purse did not belong to Ms. Sanchez.

## V.   <u>The Arrest and Arraignment of Mr. Kendrick</u>

147.   Following the second search of his apartment, the defendants formally arrested Mr. Kendrick for Ms. Sanchez's murder, now armed with three pieces of evidence they had fabricated or manufactured: (i) the lineup "identification" by Rogers; (ii) the statement accusing Mr. Kendrick by Aguilo; and (iii) the "discovery" of the purse in Mr. Kendrick's apartment.

148.   Acting in concert as part of the joint NYPD/HAPD investigation, the defendants caused the initiation of Mr. Kendrick's prosecution by providing their collection of false, misleading, and incomplete information and documentation to the Queens D.A.'s Office.

149.   On December 6, 1994, Defendant Reynolds swore to the truthfulness of a Criminal Court complaint falsely accusing Mr. Kendrick of murder and criminal possession of a weapon.

150.   The filing of that complaint in the Criminal Court, Queens County, initiated Mr. Kendrick's prosecution.

151. Mr. Kendrick was arraigned the same day before a judge of the court and remanded without bail.

152. Neither the police nor the prosecutors disclosed to the arraignment court the following exculpatory information:

     a.    Various witnesses had stated the perpetrator ran quickly from the scene, but Mr. Kendrick was disabled;

     b.    Rogers had identified a filler who was seven inches taller than Mr. Kendrick and said the perpetrator was tall like his father;

     c.    Rogers had seen the perpetrator wearing white sneakers and a white jacket, but Mr. Kendrick was wearing dark shoes and a darker jacket;

     d.    The extraordinarily suggestive and improper way in which Rogers was led to "identify" Mr. Kendrick;

     e.    Mario Aguilo's initial statement contradicting that he had seen Mr. Kendrick running into his building carrying a woman's purse;

     f.    The uniform statements of other witnesses that the perpetrator had run in the opposite direction; and

     g.    Aguilo's motive to help the police due to his robbery conviction, probationary status, and habitual use of crack cocaine.

153. But for this conscience-shocking withholding of exculpatory evidence from the arraignment judge, Mr. Kendrick likely would have been released on bail.

154. On December 8, 1994, after hearing the testimony of Rogers, Aguilo, and Defendant Reynolds, a grand jury voted to indict Mr. Kendrick for murder, robbery, and weapons possession.

155. The grand jury was misled about the strength of the evidence because the prosecution did not present any of the exculpatory information set forth in ¶ 152, *supra.*

156. Mr. Kendrick was arraigned on the indictment on January 24, 1995.

21

157.    ADA James Quinn was assigned to this case.

158.    ADA Quinn was a veteran trial prosecutor who was the chief of the Queens D.A.'s Trial Division.

**VI.    Pre-Trial Disclosures Regarding Aguilo**

159.    Prior to trial, ADA Quinn (as do all prosecutors) had an obligation, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and subsequent binding decisions of the United States Supreme Court, to fully reveal all information favorable to the defense sufficiently in advance of trial to permit the defense to make adequate use of it.

160.    ADA Quinn's *Brady* obligation included the duty to produce to the defense all information that tended to show Mr. Kendrick's innocence, all promises or inducements offered to a prosecution witness, all information suggesting such a witness had a motive, bias, or interest in the outcome of the matter, all evidence of bad acts by a prosecution witness that potentially affected such witness's general credibility, and all prior inconsistent statements of the witness.

161.    Under *Brady,* the defense was entitled to rely on the completeness and the accuracy of the prosecution's disclosure.

162.    At the beginning of the trial, when it was too late for the defense to conduct any meaningful investigation, ADA Quinn made incomplete and fundamentally misleading disclosures regarding Mario Aguilo.

163.    Quinn disclosed that Aguilo (i) had a 1993 attempted robbery conviction in Queens Supreme Court under which he had received a sentence of five years' probation, (ii) had a pending Queens case in which he was charged with robbery, grand larceny,

22

criminal impersonation, and criminal possession of stolen property for an incident that occurred on September 3, 1995, and (iii) had entered into a cooperation agreement with ADA Quinn under which Aguilo would provide "full, complete and truthful testimony" at Mr. Kendrick's trial in exchange for the D.A.'s promise, in the event Aguilo was convicted, to explore the "possibility" of his placement in a long-term drug treatment facility as a condition of his sentence.

164.    Those disclosures regarding Aguilo were substantially incomplete and misleading.

165.    Normally, "cooperation" agreements with witnesses being prosecuted by the same Office required them to enter into a *simultaneous* plea agreement resolving their case so that they would be able to testify fully about everything.

166.    Normally, if a witness were going to be given leniency such as drug treatment in lieu of incarceration, that promise too would be part of the plea agreement so that everyone knew what the witness stood to gain through his cooperation.

167.    However, Quinn did not disclose that he had made a secret deal under which Aguilo would refuse to answer any questions about the robbery he had committed on the basis of his Fifth Amendment privilege against self-incrimination.

168.    This was made possible by Quinn's agreement to allow Aguilo to defer any guilty plea to the robbery until after he had testified for the prosecution.

169.    Thus, while telling the court, the defense, and the jury that the deal was for Aguilo's "*full, complete* and truthful testimony" (emphasis added), Quinn's deal with Aguilo really meant that Aguilo's testimony would be incomplete and one-sided.

170.    Aguilo would testify against Mr. Kendrick, accusing him of the murder, but then, with Quinn's connivance, he would avoid answering any questions about his own commission of a robbery.

171.    This would deprive Mr. Kendrick's defense of his right to confront Aguilo with his own criminal history to show he lacked credibility as a witness.

172.    The announced agreement also obscured the powerful incentive it provided Aguilo to ingratiate himself with the prosecution to obtain drug treatment as an alternative to imprisonment.

173.    Quinn made it look like the D.A.'s role would be a passive one:  wait to see if Aguilo was convicted at his own robbery trial before considering whether to agree to drug treatment.

174.    However, Aguilo would only be eligible for the drug treatment program if the D.A.'s Office agreed to reduce the charges against him.

175.    This gave him an even stronger motive to please the D.A's Office by delivering favorable testimony.

176.    Quinn made this secret agreement even though he knew that a trial court in Queens, and the Appellate Division, in the infamous *Steadman* case, had excoriated his predecessor as Chief of the Trial Division, Daniel McCarthy, for similarly structuring a cooperation agreement so that the witness could hide behind a privilege and refuse to answer questions about promises of leniency that had been made to him through his lawyer. *See infra* at ¶¶ 448-63.

24

177.    Separately, Quinn also failed to disclose that Aguilo had been identified at a lineup for a second robbery, this one on September 6, 1995, in which the victim, a livery-cab driver, was shot in the chest.

178.    Finally, Quinn also refused the request of Mr. Kendrick's counsel and of the judge to disclose Aguilo's complete arrest history or rap sheet, which would have revealed that Aguilo had violated his obligation to perform community service for a marijuana conviction and been sentenced, on September 15, 1995, to 15 days in jail.

179.    Quinn claimed state law did not require him to disclose such a low-level conviction, but state law could not override federal constitutional requirements under *Brady* to disclose impeachment evidence.

180.    By refusing to disclose these circumstances, Quinn succeeded in covering them up.

181.    Quinn also should have disclosed his Office's records which showed that Aguilo had $591 in his possession when he was arrested, which suggested he wasn't just using marijuana but was selling drugs.

## VII.    **The Trial**

182.    Mr. Kendrick's criminal trial began on September 19, 1995.

183.    Throughout the proceedings, ADA Quinn engaged in improper and unlawful conduct, including suborning and failing to correct false or misleading testimony, as well as making egregiously improper comments to the jury.

184.    Quinn began the trial by improperly personally vouching for his case, telling the jury "I feel very confident" it would convict the defendant.

25

185.   Quinn then presented Brandon Rogers, then 10 ½ years old, to testify.

186.   Prior to Rogers' testimony, Quinn and/or the police defendants improperly arranged for Rogers to view the pocketbook supposedly found in Mr. Kendrick's apartment, the jacket that Mr. Kendrick was wearing when police found him six hours after the murder, and the hat that was found in his apartment.

187.   They did so to manufacture new, incriminating evidence: Rogers' "identification" of these items as the pocketbook Rogers had seen the assailant run with and the clothing he had seen the assailant wear.

188.   The clear signal to Rogers was that Quinn and the police knew these were objects worn or carried by the actual perpetrator, and thus the showup procedure involving these objects was highly suggestive.

189.   Rogers, who had seen the perpetrator from a distance of at least 100 feet, then claimed for the first time that he could recognize the pocketbook because it had a buckle in the back of it and that he recognized the jacket and the hat.

190.   On direct examination of Rogers, Quinn also tried to obscure that Rogers initially had identified the filler at the lineup and only identified Mr. Kendrick after the police led him to do so, by eliciting Rogers' false testimony that initially he had "recognized" both men and told police it was "either" No. 3 or No. 6.

191.   Quinn's effort to mislead the jury as to the lineup was partially blunted by defense counsel, who got Rogers to concede on cross-examination that he only told police that the individual in position No. 3 (Kendrick) was his "second choice" after he heard the

detective tell his mother he had selected the "wrong person," and that the jacket he had identified in court looked heavier than the one he had seen and was a different color.

192.   Quinn next knowingly elicited (and failed to correct) several instances of false and fundamentally misleading police testimony.

193.   First, Quinn elicited from both Defendants Deutsch and Dubecky that the pocketbook that the detectives claimed to have found during the December 4, 1994, search of Mr. Kendrick's home was "wedged behind the TV" or was "between the TV and the wall," which was why, in Deutsch's words, "[w]e didn't see it initially when we first went there."

194.   But Quinn knew that Deutsch and the other defendants had documented, in an evidence voucher and in the following Polaroid photograph, that they had "found" the pocketbook in the open, "on top of [a] television set":



195. Not only did ADA Quinn fail to correct the detectives' plainly false testimony about where they supposedly found the black purse, he relied on it extensively in his summation as probative of Mr. Kendrick's guilt:

> Now what does Detective Deutsch say about this pocketbook? Where do they find it? They don't find it in the drawer. They find this pocketbook in the drawer, his wife's pocketbook, the one that she identified as hers. *But this one, the one that looks like Josephine Sanchez' pocketbook, where is that found? Stashed behind the TV set between the TV set and the wall in his apartment.*

196. Detective Deutsch also separately testified falsely at trial—with no correction from ADA Quinn—about a fingerprint analysis that was conducted on that same pocketbook. Specifically, Detective Deutsch testified that the pocketbook was dusted for

fingerprints but that "[t]he results did not come back to me." This was plainly false testimony, as reflected in a December 6, 1994, DD5 drafted by Defendant Deutsch:

> Details: At appx. 1430 hrs. this date, the undersigned contacted the NYPD crime laboratory and made an inquiry with regard to the fingerprint examination requested. *Technician Guirguis advised that this examination had produced negative results. There were no fingerprints on the items.*

197.   That testimony proved deeply consequential. Indeed, it was the subject of a jury note during the jury's deliberations. Specifically, the jury note read: "We would like to hear the testimony of the results from the fingerprints from the scissor blade and the black bag." And the Court (incorrectly) answered that note on the basis of Defendant Deutsch's false testimony, telling the jury as follows: "Everybody, Mr. Greenberg, Mr. Quinn, and myself all agree that there was no such testimony of any fingerprint testing of the scissor blade or the black bag."

198.   Finally, Defendant Deutsch again provided highly misleading testimony—uncorrected by ADA Quinn—that suggested that Mr. Kendrick made an inculpatory statement that he did not make.

199.   Deutsch had obtained a statement from Mr. Kendrick, while he was in police custody, that, "If I was going to kill somebody, I wouldn't stab them with a scissor, and *I wouldn't stab them eight times, I'd stab them once or twice at most*" (emphasis added).

200.   But that statement from Mr. Kendrick was obviously inaccurate in one important aspect: Ms. Sanchez was only stabbed *twice*, not "eight times."

201.   Thus, the full statement was *exculpatory* in that it showed Mr. Kendrick was not aware of the actual circumstances of Ms. Sanchez's murder and must have learned the details (inaccurately) from a third party, quite possibly the police.

202.   But, at trial, Quinn only elicited from Deutsch the part of Mr. Kendrick's statement in which he said, "If I was going to kill somebody, I wouldn't stab them with a scissor, I would use a knife."

203.   In other words, Quinn elicited from Deutsch only the parts of Mr. Kendrick's statement that seemed to match the actual facts and not the part of the statement that was completely contrary to the facts.

204.   Quinn then argued that Mr. Kendrick must be guilty because only the killer would know that the victim was stabbed with a scissor.

205.   By failing to correct Deutsch's incomplete testimony about the content of Mr. Kendrick's statement, Quinn presented the statement in an incriminating manner that was misleading and unfair.

206.   Additionally, ADA Quinn also offered the highly misleading and incomplete testimony of a youth named Jaime Diaz, a neighbor and friend of Aguilo.

207.   Quinn called Diaz to give the extraordinarily unlikely testimony that he had some recollection of seeing a single scissor blade in Mr. Kendrick's apartment months before the homicide.

208.   Diaz had never made any such statement before.

209.    Quinn did not disclose that Diaz was Aguilo's friend and neighbor and that Aguilo had recruited him as a witness, evidently to enhance Aguilo's cooperation with the QCDAO and the benefits he hoped to receive.

210.    Next, Quinn presented Aguilo to testify to his false story that he saw Mr. Kendrick running with a woman's purse.

211.    Pursuant to his secret deal with Quinn, Aguilo refused to answer any cross-examination questions about his pending robbery case, invoking his Fifth Amendment privilege.

212.    Aguilo also falsely denied—uncorrected by Quinn—that he was still on probation for his 1993 robbery conviction.

213.    Further, Quinn failed to correct Aguilo's false testimony denying that anyone had told him that his cooperation would be made known to his sentencing judge in his robbery case and falsely denying any hope that his testimony would keep him out of jail.

214.    Misleading the defense and the jury even further, Quinn, on redirect examination, elicited from Aguilo that he had no pending case at the time he initially testified against Mr. Kendrick in the grand jury, thereby suggesting he had no motive to lie.

215.    In fact, as Quinn well knew, Aguilo was on probation for robbery at that time, was a heavy drug user, and thus faced an ongoing risk of being returned to prison for violating his probation.

216.    Mr. Kendrick testified in his own defense and denied committing the murder.

217.    Finally, Quinn capped off his misconduct by a deeply unfair and improper summation.  Specifically, Quinn, who taught trial advocacy, violated fundamental rules of advocacy constraining prosecutors by making the following false, misleading, or inflammatory arguments:

    a.    If jurors credited Mr. Kendrick's testimony they'd be "making fools of yourselves… And you weren't picked because you were fools";

    b.    Police didn't know when they questioned Mr. Kendrick that the scissor blade with fresh blood on it was the murder weapon, and thus couldn't have disclosed that to him, when in fact that always was their belief;

    c.    Mr. Kendrick had taken what he wanted from the pocketbook and then hidden it behind the TV, when Quinn knew police had documented that they found it on top of the TV and that it had not been there at all during the initial consent search;

    d.    Aguilo testified in the grand jury before he had any "deal" and had no reason to lie against Mr. Kendrick, when in fact Aguilo was on robbery probation, was a heavy drug user at the time, and knew from police that Mr. Kendrick was a suspect;

    e.    Aguilo would get no benefit from his agreement to testify unless he was convicted, when Quinn knew Aguilo had been indicted by his Office because of evidence he was guilty, that Quinn had agreed to delay the disposition of Aguilo's case until after he testified, that Quinn had structured Aguilo's deal so that he wouldn't have to answer questions about his robbery case and admit his guilt, and that Aguilo's deal with Quinn incentivized him to please the D.A.'s Office so that the latter would offer him a guilty plea to a reduced charge so that he'd be eligible for drug treatment in lieu of incarceration.

218.    On September 29, 1995, the jury convicted Mr. Kendrick of murder in the second degree and robbery in the first degree.

219.    On February 16, 1996, the court sentenced Mr. Kendrick to 25 years to life in prison.

## VIII.  **Post-Conviction**

220.    On December 14, 1998, Mr. Kendrick's direct appeal was denied.  *People v. Kendrick*, 256 A.D.2d 420 (2d Dep't 1998).

221.    On July 20, 2000, Mr. Kendrick filed a petition for a writ of habeas corpus in the United States District Court, Eastern District of New York.

222.    While the assigned *habeas* judge, the Honorable Jack B. Weinstein, wrote that he was constrained to deny the petition because of the stringent review standards for *habeas corpus* petitions, he noted the evidence of guilt was "not particularly strong," he was disturbed by the "troubling" circumstances surrounding the conduct of the lineup, and that, were he sitting "in direct appellate review of petitioner's conviction, vacatur of the judgement and a new trial would be seriously considered." *Kendrick v. Greiner,* 296 F. Supp. 2d 348, 350-53, 364 (E.D.N.Y. 2003), *aff'd,* 132 F. Appx. 391 (2d Cir. 2005).

223.    On August 17, 2016, Mr. Kendrick, now represented by *pro bono* counsel, filed a motion requesting DNA testing of various evidentiary items.

224.    Over the District Attorney's opposition, on January 9, 2017, the court granted testing of the scissor blade and the victim's fingernails.

225.    The New York City Office of Chief Medical Examiner conducted the testing and found that while there was insufficient DNA on the scissor blade for testing, Mr. Kendrick could be excluded as a contributor to male DNA found under the victim's fingernails.

33

226.    Through *pro bono* counsel, including the Innocence Project and the international law firm Wilmer Cutler Pickering Hale & Dorr ("Wilmer Hale"), Mr. Kendrick then sought a re-examination of his case by the QCDAO.

227.    However, the Office had no formal conviction review unit under District Attorney Richard Brown or his successor, Acting District Attorney John Ryan.

228.    Consequently, instead of conducting an independent review, the QCDAO assigned the original trial prosecutor, Quinn, who still was Chief of the Trial Division, to conduct the re-examination.

229.    Detective-investigators working for Quinn improperly warned Rogers not to cooperate with the defense.

230.    Quinn rejected Mr. Kendrick's application.

231.    After Melinda Katz was elected as the new District Attorney, however, her newly-formed Conviction Integrity Unit ("CIU") conducted a full reinvestigation of the matter.

232.    Rogers had given the Innocence Project a detailed affidavit recanting his trial testimony identifying Mr. Kendrick.

233.    Still intimidated by the QCDAO's detectives, he refused to cooperate any further.

234.    However, the QCDAO submitted for further testing the black purse which police claimed they found in Mr. Kendrick's apartment and which the prosecution had claimed at trial was the victim's purse.

34

235.    The results conclusively determined that the victim was not the donor of DNA found on the purse, nor was Mr. Kendrick's DNA found on it.

236.    The Office also interviewed various witnesses who had been known to the original police detectives and who now refuted Mario Aguilo's trial testimony that he had been in his girlfriend's apartment and at the murder scene at all.

237.    By motion dated November 18, 2020, the Office moved to vacate Mr. Kendrick's conviction.

238.    Noting that Brandon Rogers' original description did not fit Mr. Kendrick, the QCDAO relied on what it termed "exculpatory DNA results" and other new evidence, including the following:

   a.    The DNA results proving the purse, which the prosecutor had shown to Rogers and obtained his identification of, did not belong to the victim; and

   b.    New witness interviews proving the assailant fled in the opposition direction to that described by Aguilo, that Aguilo had not been in his girlfriend's apartment at all, and that he was not at the scene of the homicide immediately after the stabbing.

239.    On November 19, 2020, Mr. Kendrick, represented by Susan Friedman of the Innocence Project and Ross Firsenbaum of Wilmer Hale, and joined by District Attorney Katz and her staff, moved to vacate Mr. Kendrick's conviction.

240.    D.A. Katz told the court that it was more probable than not that, with the new evidence, the verdict would have been more favorable to Mr. Kendrick.

241.    Mr. Friedman pointed out still more "new" evidence supporting Mr. Kendrick's innocence:  Rogers's recanting affidavit and DNA results showing that the

fingernails of the victim, who had struggled with her assailant, contained male DNA that was not Mr. Kendrick's.

242.   Mr. Firsenbaum put on the record that investigators for the prior QCDAO administration had told Rogers not to cooperate any more with the defense.

243.   The court (Hon. Joseph Zayas, Justice) termed the conviction of Mr. Kendrick a "miscarriage of justice" that is "monumental."

244.   He said it took "way too long to discover" and that Mr. Kendrick had deserved "better than that."

245.   He called the conviction a "terrible wrong" and a "travesty of justice."

246.   As the chief administrative judge for the court, he apologized and said he was "sorry."

247.   He noted that the original prosecution had "relied heavily upon" the testimony surrounding the alleged recovery by police of the black purse from Mr. Kendrick's apartment, which the new evidence had shown had nothing to do with the crime.

248.   Mr. Kendrick thanked the new D.A., her conviction integrity unit, and his own attorneys, and then stated:

> Nobody really understands what it is to be in prison when you are innocent and you know you're innocent and you're behind the wall.  Civilization is not there.  The violence that you incur and the set-ups that go on and the harassment that go[oes] on, is just unreal … And if anything could come from this, somebody has to figure out how to stop innocent people from going behind that wall.

249.    The court then granted the motion to vacate the conviction and the D.A.'s motion to dismiss the case.

250.    After more than 26 years in prison, Mr. Kendrick was released.

251.    On January 30, 2022, after a brief taste of freedom, Mr. Kendrick died.

## FIRST CAUSE OF ACTION
### Malicious Prosecution Under New York Law
### All Defendants

252.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

253.    All the Individual Defendants, individually and in concert, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Mr. Kendrick.

254.    They did so without probable cause and intentionally caused him to be deprived of his liberty.

255.    The proceedings terminated in Mr. Kendrick's favor.

256.    Defendants City of New York and NYCHA are also liable for Mr. Kendrick's prosecution and damages under the principle of *respondeat superior*.

## SECOND CAUSE OF ACTION
### Malicious Prosecution Under 42 U.S.C. § 1983
### Violation of the Fourth, Fifth, and Fourteenth Amendments
### All Individual Defendants

257.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

258. The Individual Defendants are liable for their violation of Mr. Kendrick's constitutional rights pursuant to 42 U.S.C. § 1983 and to the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, and all his consequential damages.

**THIRD CAUSE OF ACTION**
**Evidence Fabrication Under 42 U.S.C. § 1983**
**Violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments**
**All Individual Defendants**

259. Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

260. The Individual Defendants, individually and in concert, knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to the truth, caused the manufacture or fabrication of false or patently unreliable witness statements and false or materially misleading documentary evidence implicating Mr. Kendrick in the crime.

261. The evidence they fabricated or manufactured includes but is not limited to: (i) Aguilo's false statement and misleading documentation of it in a DD5; (ii) Rogers' "identification" of Mr. Kendrick at a lineup; (iii) the false or misleading documentation of the lineup procedure and its results; (iv) the false documentation claiming that a pocketbook, supposedly the victim's, was found on the TV in Mr. Kendrick's apartment; (v) Rogers' false "identification" of the pocketbook, jacket and hat, and (vi) the Criminal Court complaint falsely accusing Mr. Kendrick of the crime.

262. The Individual Defendants manufactured false evidence for the purpose of causing criminal charges to be approved, and criminal proceedings to be initiated and continued, against Mr. Kendrick.

263.   They forwarded or caused the forwarding of such false or manufactured material to prosecutors for use against Mr. Kendrick.

264.   They knew that the evidence they forwarded to prosecutors would be likely to influence a jury's decision at trial.

265.   As a result of the defendants' aforementioned conduct, prosecutors initiated and continued a prosecution of Mr. Kendrick through trial and he was deprived of his liberty.

266.   The defendants' conduct violated Mr. Kendrick's right to be free from unreasonable seizure as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, and his rights to procedural and substantive due process and a fair trial as guaranteed to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

267.   Alternatively, the individual defendants had an affirmative duty to Mr. Kendrick to protect his above-mentioned constitutional rights from infringement by other government officials.

268.   Each of the Individual Defendants knew that Mr. Kendrick's constitutional rights would be violated if the conduct of the other government officials caused false, manufactured, fabricated or obviously unreliable evidence to be used against Mr. Kendrick and to deprive him of his liberty.

269.   Each of the Individual Defendants had reasonable opportunities to intervene to prevent such infringement of Mr. Kendrick's constitutional rights.

270.    Nevertheless, each of the Individual Defendants deliberately, willfully, recklessly, and/or with deliberate indifference to the truth failed to take reasonable steps to intervene.

271.    As a result of the Individual Defendants' conduct and/or failure to intervene, Mr. Kendrick's liberty was infringed or curtailed, all in violation of his Fourth, Fifth, Sixth and Fourteenth Amendment rights.

272.    The above misconduct by the Individual Defendants was outrageous and shocking to the conscience.

273.    By virtue of the foregoing, the Individual Defendants are liable to Plaintiff for all his consequential damages under 42 U.S.C. § 1983.

**FOURTH CAUSE OF ACTION**
**Withholding of Exculpatory Evidence, "Shocking to the Conscience," That Caused**
**Mr. Kendrick's Loss of Liberty Under 42 U.S.C. § 1983 ("Russo Claim")**
**Violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments**
**All Individual Defendants**

274.    Plaintiff repeats and realleges each allegation contained in the foregoing paragraphs as if fully set forth herein.

275.    Pursuant to the Fourth, Fifth, Eighth, and Fourteenth Amendments, Mr. Kendrick had a federal constitutional right to timely disclosure to his defense of exculpatory and other information which, considered in its totality, would be likely to result in his release from custody before trial.

276.    Indeed, under the Eighth and Fourteenth Amendments, all criminal defendants have a federal constitutional right not to be held on excessive bail.

277.    It was commonly known to police detectives, including the Defendants named in this case, that, under New York's criminal procedure law, the strength of the prosecution's case was a statutory factor that a judge was required to consider in determining whether to grant pretrial release.

278.    Accordingly, the prosecution was required to disclose exculpatory and other evidence that, if known to the defense and the court, would be likely to result in the defendant's pretrial release.

279.    Otherwise, the court would be misled about the strength of the prosecution's case and might deny bail entirely or fix an amount that was excessive under the true circumstances.

280.    This created a duty for detectives who knew or should have known of the existence of such evidence to immediately disclose it to the QCDAO.

281.    Further, it was commonly known as well to police detectives, including the Defendants named in this case, that the existence of exculpatory evidence might influence a prosecutor's decision whether to seek an indictment and the grand jury's decision whether to approve one.

282.    Prosecutors were required to disclose such evidence to the defense so that it could exercise its right under state law to ask the grand jury to call exculpatory witnesses and consider exculpatory or other evidence favorable to the defendant.

283.    Absent the disclosure of such evidence to the defense or the presentation of it to the grand jury, the grand jurors would be misled about the strength of the prosecution's case and thus whether to approve an indictment.

41

284.    In this case, the Individual Defendants did not timely disclose to prosecutors handling the initial arraignment of Mr. Kendrick, as well as the subsequent grand jury presentation, exculpatory and impeachment information showing the likely innocence of Mr. Kendrick or at least the weakness of the evidence against him.

285.    The information they failed to disclose included, but was not limited to, (i) Brandon Rogers' complete description of the perpetrator, including that he was 6'2" when Mr. Kendrick was 5'7", which virtually ruled him out; (ii) other details of Rogers' initial description which contradicted Mr. Kendrick's appearance and Aguilo's description; (iii) Rogers' identification of a filler and the full circumstances under which he was caused to change his mind and "identify" Mr. Kendrick; (iv) Aguilo's initial statement that he saw nothing significant, which completely refuted his later statement; (v) Aguilo's robbery record and probation and his current addiction to illegal drugs; (vi) the statements of other witnesses that they had not seen Aguilo at the scene of the crime, contrary to his claim; (vii) the negative results of the search of Mr. Kendrick's apartment and that they had planted the pocketbook they claimed to have found on top of the television; (viii) the absence of any other forensic evidence implicating Mr. Kendrick; and (ix) the Defendants' unlawful detention of Mr. Kendrick for the Rogers' lineup without probable cause, which required the results of the lineup to be suppressed.

286.    As a result of the Defendants' withholding of the aforementioned information, the court decided to detain Mr. Kendrick, he was wrongfully indicted, and he was deprived of his liberty for the entire period before his trial.

287.    The Defendants' conduct was shocking to the conscience.

42

288.    Accordingly, the Defendants are liable to Plaintiff pursuant to 42 U.S.C. § 1983 for all his damages.

### FIFTH CAUSE OF ACTION
**Withholding of Information Favorable to the Defense Pursuant to**
***Brady v. Maryland*, 373 U.S. 83 (1963) Under 42 U.S.C. § 1983**
**Violation of the Fifth, Sixth, and Fourteenth Amendments**
**All Individual Defendants**

289.    Plaintiff repeats and realleges each allegation contained in each of the foregoing paragraphs as if fully set forth herein.

290.    Pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Mr. Kendrick had a federal constitutional right to timely disclosure by the prosecution, in advance of trial, of all material information favorable to his defense, including information tending to show his innocence and information tending to impeach the credibility of a prosecution witness, so that the defense could make adequate use of it during pretrial hearings and at trial.

291.    The prosecution had an obligation to disclose such information without regard to good or bad faith, so long as the information was material to the defense in that it would create a reasonable probability of a more favorable outcome or undermine confidence in a conviction.

292.    This in turn imposed an obligation on police detectives investigating a case to make timely disclosure of all information favorable to the defense so that the prosecution could make a judgment whether to disclose it to the defense.

293.    In this case, as set forth above, the Individual Defendants affirmatively concealed from, or failed to disclose to, the prosecution, information that was exculpatory,

impeaching of the prosecution's witnesses, or both, including but not limited to the information set forth in ¶ 285, *supra.*

294.    This information was material to the outcome of the trial.

295.    The defendants acted knowingly, intentionally, willfully, recklessly, with deliberate indifference to their obligations, and/or negligently, in failing to disclose the favorable information.

296.    The defendants' failure to disclose was a substantial cause of Mr. Kendrick's conviction and his damages deriving therefrom.

297.    Accordingly, the individual defendants are liable to Plaintiff pursuant to 42 U.S.C. § 1983.

### SIXTH CAUSE OF ACTION
*Monell* Liability for the Policies, Practices, and Customs of the New York Police Department and New York City Housing Authority Under 42 U.S.C. § 1983. Defendants the City of New York and New York City Housing Authority

298.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

299.    The foregoing violations of Mr. Kendrick's federal constitutional rights and injuries were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendants City of New York and NYCHA, amounting to deliberate indifference to the constitutional rights of persons, including Mr. Kendrick, who are investigated by NYPD and NAPD detectives and subsequently prosecuted for alleged criminal offenses.

300.    Prior to Mr. Kendrick's arrest, policymaking officials at the NYPD and HAPD, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting, and convicting innocent people, and to the rights of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning:

       a.    The use of excessive promises of rewards and unduly coercive or suggestive interrogation techniques with vulnerable potential witnesses, including drug users and addicts, drug dealers, and/or individuals fearing prosecution and imprisonment for their own criminal behavior;

       b.    The use of unduly suggestive and unlawful identification procedures causing the manufacturing of false or highly unreliable identification evidence;

       c.    The determination of probable cause to make an arrest; and

       d.    The duty of police detectives and investigators to preserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all evidence or information (*"Brady* material") favorable to a person accused of criminal conduct, including, but not limited to, evidence of innocence, evidence that an identification or other prosecution witness is unreliable or lacks general credibility, evidence that a prosecution witness has made inconsistent statements about material facts, and evidence that a prosecution witnesses has a motive, bias or interest affecting his credibility or has been pressured, coerced, or made promises, so that the District Attorney may comply with his constitutional obligation to disclose such information to the defense under *Brady*.

301.    With respect to "a" (excessive promises of rewards to witnesses and coercive and suggesting interrogations) and "d" (nondisclosure of *Brady* material) in the preceding

paragraph, prior to Mr. Kendrick's arrest and the initiation of his prosecution in 1994, the NYPD and HAPD provided no training at all.[1]

302. The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking

---

[1] Counsel for the undersigned has deposed numerous police officers and detectives in other lawsuits concerning their training and their knowledge of *Brady* disclosure requirements as of the mid-1990s. Virtually all such witnesses have testified that they received no *Brady* training and had no idea what "*Brady*" is or means. Similarly, such witnesses have testified that they received no training to record exculpatory or impeachment information in their reports, to disclose such information to prosecutors, or to follow up exculpatory leads. They testified that they received no training in the interrogation or evaluation of accomplice or "cooperating" witnesses in order to avoid unduly influencing their stories or testimony, determine their credibility, and assess whether their statements made out probable cause to arrest or prosecute. These deposition transcripts are in the possession of Plaintiff's counsel and of the City of New York. *See* e.g., Deposition of Homicide Det. Vincent Gerecitano, *Collins v. City of New York,* 11-cv-766 (FB) (E.D.N.Y.)**,** at p. 43 ("The *Brady* Rule, I don't know what that is."); *id*. at p. 311 ("no training that I could think of" regarding making a record that a newly-"cooperating" witness was going through drug withdrawal, explaining: "I could see somewhere down the road having a conversation with the district attorney saying what the fuck did you put that down for, how do you feel this is relevant, the guy is giving you information and you're knocking him out of the water."); Deposition of Det. Jose R. Hernandez, *Collins, supra,* at pp. 33-34, 36 ("never heard of" *Brady* and cannot recall any training about how to evaluate witness credibility); Deposition of NYPD Inspector Paul Amundson, *Zahrey v. City of New York, et al.*, 98 Civ. 4546 (DLP) (S.D.N.Y.), at p. 107 (received no *Brady* training prior to 1995); Deposition of Internal Affairs Det. Kelly Wirth, *Zahrey, supra,* at pp. 26-31 (possibly received a "couple hours" of general training about dealing with confidential informants, but recalls no training about how to evaluate the credibility of such witnesses); Deposition of then-Capt. Robert Boyce, *Zahrey, supra,* at pp. 20-22, 35-36 (never heard of "*Brady v. Maryland*," received no training concerning documenting or disclosing to defense counsel exculpatory or impeachment evidence, and cannot recall any training about how to evaluate the credibility of cooperators or informants); Deposition of Det.-Sgt. Michael McWilliams, *Zahrey, supra,* at pp. 28-29, 35-36, 37-38 ("I don't know what *Brady v. Maryland* is" and received no *Brady* training); Deposition of Det. Daniel Toohey, *Poventud v. City of New York,* 07-cv-3988 (DAB) (S.D.N.Y.), at pp. 145-46 (does not know what "*Brady* material" is and recalls no such training; training regarding interrogating accomplice or criminally-involved witnesses was to "[s]peak to them"; no training to bring evidence favoring the suspect to the prosecutor's attention).

officials for the Defendants City of New York and NYCHA, including but not limited to,

the NYPD and HAPD Commissioners, who knew (or should have known):

   a.   to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

   b.   that such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

   c.   that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

303.   The aforementioned policymaking officials had the knowledge and the notice

alleged in the preceding paragraphs based upon, among other circumstances:

   a.   Credible allegations, many substantiated by judicial decisions finding, that NYPD detectives had wrongfully withheld material evidence, manufactured false or unreliable identification and other evidence through improper suggestion, promises, or coercion, and/or knowingly given false or misleading testimony;

   b.   civil lawsuits, some of which resulted in substantial civil settlements, credibly alleging that police had falsified, exaggerated, or withheld material evidence, or conducted searches or made arrests without probable cause;

   c.   numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, Federal District Courts, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under *Brady* as well as the probable cause requirement of the Fourth Amendment;

   d.   judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their *Brady* obligations and for failing to adopt adequate *Brady* disclosure policies, *see Carter v. Harrison*, 612 F.

Supp. 749 (E.D.N.Y. 1985) (McLaughlin, D.J., adopting the Report and Recommendation of then Magistrate Shira A. Scheindlin), and putting the NYPD on notice that the City could be held liable for its failure to adequately train police officers and investigators regarding their obligations to provide truthful testimony and to disclose evidence that favors criminal defendants under *Brady*, *see Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Carter v. Harrison, supra*;

e.   formal reports of the N.Y.C. Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the N.Y.C. Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action;

f.   the Mollen Commission Report, dated July 7, 1994, following a two-year investigation and a year of hearings, finding a "culture of corruption" in the NYPD, pervasive misconduct by NYPD officers and detectives including the fabrication of evidence and testimony, and tolerance of this culture and misconduct by the department's leaders; and

g.   the inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers and their powerful incentives to close cases and to obtain arrests and convictions.

304.   Many of the aforementioned illegal practices, their toleration by police policymakers, and the culture of corruption that their indifference created, were documented, before the prosecution and conviction of Mr. Kendrick, in the aforementioned Mollen Commission Report, formally known as the Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the NYC Police Department, dated July 7, 1994.

305.   The Mollen Commission was formed in 1992 after widespread reports of police corruption, including, among other things, the fabricating of evidence in criminal investigations.

48

306.   The Commission conducted an investigation and held hearings over two years, leading to its issuance of a formal report.

307.   The Mollen Commission found that

> [o]fficers . . . commit falsification to serve what they perceive to be "legitimate" law enforcement ends—and for ends that many honest and corrupt officers alike stubbornly defend as correct. In their view, regardless of the legality of the arrest, the defendant is in fact guilty and ought to be arrested. Officers reported a litany of manufactured tales. . . .
>
> Frustrated by what they perceive to be unrealistic rules of law and by their own inability to stem the crime in their precincts through legal means, officers take the law into their own hands. And police falsification is the result.

Report at 38.

308.   The report noted: "Several officers . . . told us that the practice of police falsification . . . is so common in certain precincts that it has spawned its own word: 'testilying.'" *Id.* at 36.

309.   In one NYPD unit, the Commission found that "the unit's commanding officer not only tolerated, but encouraged, th[e] unlawful practice" of "falsif[ying] documents" and "committ[ing] testimonial perjury." *Id.* at 39.

310.   The Commission concluded that there existed

> … a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful. . . . This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that?  They're guilty."

*Id.* at 41.

311.   The Commission also noted that

> the Department's top commanders must share the blame. . . . We are
> not aware of a single instance in which a supervisor or commander
> has been sanctioned for permitting perjury or falsification on their
> watch.
>
> Nor do we know of a single, self-initiated Internal Affairs Division
> investigation into patterns of police perjury and falsification. . . .
> Internal Affairs over the last decade had no record of the number of
> falsification allegations brought against officers throughout the
> Department or in a particular precinct or command. There is no
> evidence that anyone in the Department's chain of command had
> focused on eliminating this practice, including past Police
> Commissioners and Internal Affairs chiefs, *who apparently turned a
> blind eye to unlawful practices that were purportedly committed to
> fight crime and increase arrest statistics.*

*Id.* at 41-42 (emphasis added).

312.   Consistent with the findings of the Mollen Commission, NYPD and HAPD
policymakers were aware, prior to Mr. Kendrick's prosecution, that many detectives
habitually violated proper police protocol regarding the investigation of homicides and
other felonies, including the use of coercive or unduly suggestive interrogation techniques,
the use of unduly suggestive identification procedures, the preparation of false or
misleading documentation, and the suppression of evidence favoring the suspect known as
*Brady* material.

313.   However, policymakers did little or nothing to prevent such misconduct,
resulting in countless wrongful arrests, prosecutions, and convictions that were directly
attributable to such policymakers' deliberate indifference.

314. As noted above, NYPD and HAPD detectives were trained together and frequently were assigned, as in Mr. Kendrick's case, to collaborate on investigations of homicides and other crimes committed in whole or in part on NYCHA property.

315. One corrupt, notorious HAPD investigator who collaborated often with the NYPD in investigating drug-related crimes, and then became an NYPD officer, was Michael Codella.

316. As he admitted proudly in his book, "Alphaville," St. Martin's Press (2010), Codella, while assigned to Manhattan's Lower East Side in the late 1980s and through the mid-1990s, would illegally search and beat up suspects, plant evidence on them, coerce false confessions from them, take money from them, and brazenly lie about it to judges, prosecutors, defense lawyers, and Internal Affairs investigators.

317. Codella admitted that he would force drug dealers and junkies to manufacture false robbery complaints when the Police Department wanted to increase robbery arrests.

318. Codella wrote in his book:

> I'd rewritten the *Patrol Guide* in order to suit my own needs. I'd lied to bosses, friends, and district attorneys, told IAB [Internal Affairs Bureau] to go fuck themselves, and taught people I worked with to do the same. I'd committed my own crimes to ensure that arrests were made and bad guys went to jail.

319. Codella admitted coercing a confession out of a suspected rapist by stomping on his head, kicking his ribs, choking him until he passed out, kneeing him in the mouth until "[b]lood surged through his teeth," and, winking to his partner, taking the suspect to

the bathroom, putting a gun to his head, cocking the hammer, and saying, "Either your confession, or your brains, will be all over that paper in five minutes."

320. Codella acknowledged being the subject of nearly two dozen Internal Affairs and other misconduct complaints.

321. Notwithstanding their awareness of the extraordinary number of serious complaints made against him, the HAPD, and later the NYPD, continually promoted Codella, allowed him to train and supervise other officers, worked with him on joint investigations, and recommended him for assignment to a Joint State-Federal Narcotics Task Force.

322. Ultimately, Codella became a detective-sergeant with the NYPD, where he retired in 2003, having left behind him a trail of blood, gore, and false arrests and convictions.

323. One false conviction case involved Danny Colon and Anthony Ortiz.

324. Codella framed Ortiz, a young, small-time drug dealer, when he wouldn't assist Codella and a NYPD detective, James Theis, in pinning a 1989 drug-related double-homicide near the FDR Drive in lower Manhattan on Colon, believed to be a more significant drug dealer at the time.

325. On or about August 12, 1990, Codella arrested Ortiz on narcotics charges.

326. Codella told Ortiz, in words or in substance, that he should cooperate with the police and become an informant, or else he would soon be arrested for a murder that Codella acknowledged Ortiz was not responsible for.

327. Codella had learned from Theis or others in the NYPD that Ortiz was

going to be charged with a murder he had not committed, to pressure him to testify against Colon.

328.    On or about October 12, 1990, Theis took custody of Ortiz and formally arrested him for the FDR murders.  Colon was arrested soon thereafter.

329.    During the arrest processing, Theis told Ortiz, in words or in substance, that Theis knew who the real murderers were, that Theis knew Ortiz was not one of them, and that Ortiz should save himself by cooperating.

330.    When Ortiz refused to cooperate, Theis brought him to court to be arraigned on an indictment containing the false murder charges.

331.    Codella later became aware that the Manhattan District Attorney's Office had recruited another cooperator, a murderous drug kingpin named Danny Core, to testify against Colon and Ortiz.

332.    Codella knew, from his own sources and investigation, as he wrote in his book, that Core in reality was responsible for the murders.[2]

333.    Furthermore, Codella knew and believed, according to his book, that Core had "killed dozens of people," many more than he had admitted to the District Attorney's Office.

334.    Convicted at trial in 1993 for the murders, Colon and Ortiz spent 19 years each in prison until the New York Court of Appeals vacated their convictions for *Brady* violations and their case was dismissed.

---

[2] In his book, Codella changed certain names.  He changed Core's name from "Danny Green Eyes" to "Davey Blue Eyes."

335.   Their lawsuits against Codella, Theis, the City of New York, and NYCHA were then settled in 2013 for a total of $9.5 million.

336.   Two other detectives whose repeated misconduct NYPD policymaking officials also repeatedly turned a blind eye to were the notorious Louis Scarcella and Stephen Chmil.

337.   In 1988, in the murder prosecution of James Jenkins, Brooklyn Supreme Court Justice Francis X. Egitto, following a hearing, found that the "pretrial identification procedures employed by [Scarcella] were unduly suggestive and prejudicial to defendant."

338.   The decision detailed how Scarcella, in violation of proper police practice and constitutional requirements, had shown a single photo of Jenkins to two witnesses instead of a photo array.

339.   It also detailed how, upon Jenkins's arrest, Scarcella had brought five witnesses to the precinct and conducted the following improper identification procedure:

> The witnesses were not separated prior to viewing defendant. Indeed, they were individually and collectively told by Detective Scarcella that "we arrested the man we believe was responsible for the death of the deceased; I would like you to take a look at him."  After each witness individually viewed the defendant through a two-way mirror, that witness was returned to the room where his fellow witnesses waited. No effort was made to keep the witnesses from discussing their viewing of defendant who was observed, alone, in a room.

340.   The court concluded:

> The practices here utilized represent *a classic illustration of what not to do in conducting pretrial identification procedures*. It was unnecessary to display to the witnesses a single photo; no exigent circumstances justified a showup; and no argument can be advanced to support Detective Scarcella's telling the witnesses that the police had "arrested the man we believe was responsible for the death of the

deceased." Based upon this *abysmal showing, and the Police's patent disregard for accepted identification procedures*, the court is left no choice but to exclude from trial all mention of such practices [emphasis added].

341. Notwithstanding Justice Egitto's harsh criticism, the NYPD took no disciplinary action against, and conducted no investigation of, Scarcella.

342. Accordingly, Scarcella repeated his misconduct in 1990 in the David Ranta case.

343. Ranta was charged with murder in the high-profile shooting death of a beloved Orthodox rabbi earlier that year.

344. Scarcella and his frequent partner Chmil were assigned to investigate the killing.

345. At a pretrial hearing, Scarcella testified that several months after the shooting, he spoke to a man named Alan Bloom, who had been arrested near the shooting location.

346. Bloom was facing numerous robbery charges and many years in prison and was incarcerated at Rikers Island.

347. Scarcella testified that Bloom had implicated men by the names of David and Steve but did not give last names.

348. Scarcella testified that he then located photos of David Ranta and Steve Sicar, placed them in a photo array or photo arrays, and showed them to Bloom, who identified both men as having participated in the shooting.

349. At the hearing, Justice Egitto expressed his incredulity:

I'm still interested when a person gets arrested, when we have a police officer who tells us the name Steve comes up and he goes ahead to the Catch Unit and picks out a picture of Ranta and Steve when nobody told him Steve's last name. I don't know if he's a medium of some kind. He also picked out the name of Ranta before anyone told him Ranta's last name. From what I gather he heard the name David. Lo[] and behold they are the right people.

It stretches the credulity of the court in how these pictures are obtained.

350.    Scarcella and Chmil manufactured a lineup identification of Ranta by blatantly suggesting to a witness whom he should pick.

351.    Justice Egitto again admonished Scarcella, and now Chmil too, on the record:

The more I hear this the more I am disillusioned with the work of the detectives.

Here a young man of 14, 15 years of age says specifically I *think* it is number three. The cop, probably Scarcella or Chmil, says, okay, number three. From there on in the kid goes along with the number three . . . .

He said, I *think* it is number three, which is not identifying any one [emphasis added].

352.    This witness later revealed that a detective had told him to "pick the guy with the big nose."

353.    Justice Egitto made the following additional remarks about Scarcella's and Chmil's conduct during the Ranta investigation:

I think what they have done in this case, in my opinion, is decide that Mr. Ranta was the person, the guilty party, and then they went out of their way to make sure it tied up neatly in a package. . . .

[T]hey decide the case and that is the reason why *a lot of our cases are being blown out* when the People only have the police officers to rely upon for their statements, such as narcotics cases and gun cases. *The detectives have to be taught here in New York State, unlike a lot*

56

*of other places, we have a constitution.* And they have to live up to it. . . . I think it is ridiculous the way cops take it upon themselves to be judge, jury, and partial executioner. . . .

I tell you this. In my opinion throughout this case the two detectives did all they could to tie it up in a neat package. . . . I don't think what they did and the manner in which they did it was, shall we say, absolutely fair. [emphasis added]

354.    As a result of Scarcella's and Chmil's misconduct, Ranta was convicted.

355.    Despite Justice Egitto's comments, the NYPD conducted no meaningful investigation of their misconduct and took no action to discipline them.

356.    As a result, Ranta remained in prison until the Kings County District Attorney's Office itself finally moved to vacate Ranta's conviction in 2013, after The New York Times exposed the misconduct of Scarcella and Chmil in the Ranta case and in numerous other convictions.

357.    It also was or should have been known to NYPD policymakers that in six different homicide prosecutions, Scarcella had used the false and inherently unbelievable "eyewitness" identifications of suspects by a single witness, Teresa Gomez, a drug addict.

358.    In these and numerous other cases investigated by Scarcella and Chmil, they pressured drug addicts to provide false evidence and used unlawful means to coerce or fabricate confessions and false identification evidence, causing numerous wrongful convictions that were not remedied until many years later.

359.    Scarcella was open about his attitude, saying: "Are there rules when it comes to homicide?  No. No, there are none. I lie to them. I will use deception. The bad guys don't

play by the rules when they kill Ma and Pop, shoot them in the head, ruin the lives of their family. I don't play by the rules."

360.   As one judge stated in overturning such a conviction:

> The findings of this court are that *the assigned Detective, Louis Scarcella, was at the time of the investigation [in 1991] engaged in false and misleading practices*. The cases of David Ranta, Derrick Hamilton, Robert Hill, Alvena Jennette and Darryl Austin that were investigated by Scarcella and prosecuted contemporaneously with this case in the early nineties demonstrate this *pattern and practice*. [This decision was issued before several more cases involving Scarcella were overturned.]  The *pattern and practice of Scarcella's conduct which manifest a disregard for rules, law and the truth* undermines our judicial system and gives cause for a new review of the evidence.

*People v. Hargrove*, 49 Misc.3d 1208(A), at *8 (N.Y. Sup. Ct. Kings Cty. 2015) (emphasis added), *aff'd*, 162 A.D.3d 25 (2d Dep't 2018).

361.   Based on the above pervasive misconduct by Scarcella and Chmil, NYPD policymaking officials knew or should have known that the detectives were coercing confessions, manufacturing false or unreliable identification evidence, intentionally securing testimony that they knew to be false, giving false testimony themselves, and suppressing evidence favorable to criminal defendants which they knew they were obligated to disclose.

362.   Yet these policymaking officials failed to take meaningful steps to supervise or discipline Scarcella or Chmil to ensure that such misconduct did not continue.

363.   Instead, the NYPD treated Scarcella and Chmil as heroes for obtaining arrests and convictions at a blistering rate, thus sending a clear message to the entire NYPD police force that such misconduct would be not just tolerated but celebrated.

364.    Another of the many homicide detectives who engaged in repeated misconduct to which NYPD policymakers were deliberately indifferent was Michael Race.

365.    Race admitted that he investigated 750 murder cases, through the late 1980s and early 1990s, but only one was "done the correct way, from A to Z."

366.    An NYPD colleague testified that Race

> had a reputation among detectives for feeding informants and witnesses details about crimes [and] that Race had a reputation of referring informants and witnesses to the TIPS hotline so they could collect rewards for information, which is a violation of police procedure because of the risk of kickbacks.

*Blake v. Race*, 487 F. Supp. 2d 187, 204 (E.D.N.Y. 2007).

367.    In 1990, Race caused both Jeffrey Blake and Ruben Ortega to be arrested and convicted on the word of a single informant produced by Race, Dana Garner.

368.    Race fed Garner the details that Garner then provided in testimony against the two men.

369.    At trial, Garner tried to recant his story, but after prosecutors threatened him, he retook the stand and testified against Blake.

370.    A cousin of Garner's testified that Garner had not been in New York at the time of the double murder.

371.    Two years later, Garner signed a sworn statement saying that he had not witnessed the killings for which Blake was convicted, but he then refused to testify to this in court.

372.    In 1998, the KCDAO conceded that Garner was an unreliable witness and consented to vacating Blake's conviction.

373. In 1999, Garner signed a sworn statement recanting his accusations against Ortega and against another man, Timothy Crosby, whom Garner had previously accused of kidnapping him, resulting in Crosby's conviction and sentence of 10 years to life.

374. That same year, a state judge vacated Crosby's conviction after finding Garner to be "a completely unreliable witness."

375. In 2003, the Second Circuit vacated Ortega's conviction based on the unreliability of Garner's testimony.

376. During civil litigation following the vacatur of Blake's conviction, Garner testified that Race had fed him the details that he repeated in his allegations and eventual testimony in the Blake and Ortega cases. He also testified that Race had threatened to charge him with crimes if he didn't implicate Blake and Ortega.

377. Despite Garner's evident unreliability as a witness and Race's reputation among his NYPD colleagues for feeding witnesses details about crimes, NYPD policymaking officials made no meaningful efforts to scrutinize Race's conduct in these investigations.

378. Another case that illustrates the pattern of misconduct to which NYPD policymaking officials were deliberately indifferent is that of Zaher Zahrey.

379. From 1994 to 1996, various senior detectives from the NYPD's Internal Affairs Bureau ("IAB"), including supervisors, tried to frame Zahrey, a decorated NYPD undercover narcotics detective whom they wrongly suspected of being corrupt, for drug-related crimes including murder.

380.   The initially-assigned detective, Sgt. Robert Boyce, tape-recorded himself encouraging a state prisoner whom he knew to be serial robber and murderer and to be addicted to crack, Sidney Quick, to adopt a false story Boyce suggested to him implicating Zahrey in a series of murders, robberies, and drug deals.

381.   Boyce knew the story was false because it contradicted Quick's prior statements as well as independent police investigation.

382.   Boyce improperly promised Quick a "very, very, very sweet deal" and to "drive [Quick] home" if, contrary to his prior statements, he'd "nail Zack to a cross" by accusing Zahrey of being present for and participating in these crimes.

383.   Later, when other IAB detectives could not corroborate Quick's manufactured claims, they convinced the United States Attorney's Office in Brooklyn to take over the case by concealing Boyce's tape of Quick.

384.   While Quick was refusing to cooperate with the federal authorities, another assigned IAB detective, Kelly Wirth, worked with a prosecutor from the KCDAO, Teresa Corrigan, to use secret coercion and under-the-table promises to induce Quick into agreeing to testify.

385.   Zahrey ultimately was acquitted, but not until he had spent nearly nine months in jail on the false charges.

386.   Zahrey also was acquitted by an NYPD administrative judge who found that Boyce had led Quick to manufacture false allegations, a finding that was ratified by the Police Commissioner.

387. The finding by the administrative judge, ratified by the Police Commissioner, that Boyce had led a witness to manufacture false allegations ruining the career of a decorated detective and sending him to jail for nine months, did not stop the NYPD from continually promoting Boyce until he received the ultimate reward: appointment as Chief of Detectives for the entire department.

388. None of the other IAB personnel involved in the Zahrey case were disciplined either; instead, most were promoted.

389. NYPD detectives also committed misconduct to obtain a corrupt murder conviction in 1995 in the Jabbar Collins case.

390. Brooklyn detectives suspected Collins of having committed the botched robbery-murder of an Orthodox rabbi-landlord in 1994 in Williamsburg.

391. The assigned detective, Vincent Gerecitano, a veteran homicide investigator, refused to accept the denial of a heroin addict, Edwin Oliva, who had just been arrested for an unrelated robbery committed in the same building, that he knew anything about the murder in question.

392. Gerecitano detained Oliva for many hours and interrogated him while he was going through withdrawal and was drooling, crying, exhausted, and desperate.

393. Gerecitano coerced Oliva into signing a sworn written statement implicating Collins by refusing to summon medical assistance for Oliva while simultaneously promising him that he would assist Oliva in obtaining leniency from the Brooklyn D.A.'s Office.

394.   Gerecitano omitted all these circumstances from his written report and never disclosed them to prosecutors.

395.   Later, before trial, Oliva recanted his coerced written statement, but prosecutors, evidently unaware of how Gerecitano had coerced Oliva's original sworn written statement, brought in Gerecitano to pressure Oliva to recant his recantation.

396.   Ultimately, in 2010, after Collins had spent 16 years in prison, prosecutors revealed the recantation, a federal judge ordered Collins's release, and all charges were dismissed.

397.   Collins later received a $10 million settlement from New York City and $3 million from the State.

398.   NYPD detectives also used improperly suggestive identification procedures, as they did in some of the cases discussed previously in this Complaint and as they did in this case, to manufacture false or unreliable identification evidence in numerous homicide and other serious felony cases.

399.   After the arrest of Kareem Bellamy in 1994 for a stabbing death, NYPD Detective John Gillen conducted a lineup that included Bellamy.

400.   The only known eyewitness could not positively identify Bellamy.

401.   As in Mr. Kendrick's case, the detective took the witness into a private room for an improper, private meeting, after which the witness suddenly claimed to be certain that Bellamy was the perpetrator.

402.   The witness's identification of Bellamy was a significant cause of Bellamy's conviction at trial.

403.   He was incarcerated for 14 years before his conviction was overturned and the charges against him were dismissed.

404.   He received total settlements of nearly $11 million.

405.   In 1996, the same Detective Gillen conducted a lineup in the investigation of Emmett Wheaton for a robbery.

406.   At the lineup, Wheaton heard Gillen saying to the witness, "Is it number four?  Is it number four?  Is it number four?"

407.   The witness picked out Wheaton (No. 4) and he was arrested and charged.

408.   Wheaton was acquitted at trial, but only after spending almost a year in jail.

409.   In 1999, NYPD detectives brought Jason Chambers, who had witnessed a murder, to view a lineup containing suspect Pierre Jenkins. Chambers picked Jenkins.

410.   The next year at a pretrial hearing, Chambers testified that he had picked Jenkins only after the detectives had told him: "[Y]ou got to pick somebody. It was like, you got to get him. Pick somebody."

411.   Chambers then recanted his identification of Jenkins.

412.   Asked why he had picked Jenkins originally, Chambers said: "Because the detectives were, like, you had to pick somebody. I just wanted to go home and they were just, like, forcing me to pick somebody."

413.   After Chambers's recantation, prosecutors dropped the murder charges against Jenkins.

414.   In 1999, NYPD detectives investigating a 1999 deadly shooting conducted a lineup containing suspect Ronald Ambrose.

415.    Witness Edgar Rivera had, within an hour of the shooting, identified another man as the perpetrator.

416.    Rivera viewed the lineup containing Ambrose and did not identify Ambrose.

417.    Detective Jose Rosario then took Rivera into an office at the police precinct. Approximately 20 minutes later, Rosario and Rivera returned, and Rivera positively identified Ambrose as one of the shooters.

418.    After this identification, Ambrose was indicted for murder.

419.    Based on independent exculpatory evidence, Ambrose was acquitted at trial, but only after having served over two years in pretrial detention.

420.    During all relevant times, it was the established procedure and practice of the NYPD to ask eyewitnesses, following their viewing of lineups, to review and sign lineup report forms in which the police "subject" or "suspect" was identified.

421.    This practice caused eyewitnesses, such as Brandon Rogers, who had doubts about their recognition of a participant in the lineup, to become more certain and to testify much more strongly later at hearings or trials.

422.    Pursuant to this practice, in 2005, during the investigation of a Queens shooting, an eyewitness, when viewing suspect Julio Negron, said "I think," or "I believe," that's the shooter, but did not make a positive identification.

423.    Detectives and a Queens ADA manufactured his positive identification by showing the eyewitness a lineup report identifying Negron as the police suspect, then taking him into a private room and speaking to him for 15 minutes.  Negron spent nearly 10 years in prison before the New York Court of Appeals reversed his conviction.

424.    In 2009, Ricardo Benitez, a parolee, was arrested on suspicion of robbing a Radio Shack store in Queens.

425.    NYPD officers Raul Lopez and Frank Libretto deliberately prepared a highly suggestive lineup to ensure that Benitez was identified.

426.    Benitez appeared to be 15 to 20 years older than the fillers in the lineup, had much darker skin, was noticeably thinner, and was sickly-looking, unshaven, and disheveled, whereas the fillers all were hale and clean-cut police officers.

427.    A Queens ADA, Tino Grillo, who was present to supervise the lineup, told Detectives Lopez and Libretto that it was improperly suggestive, but then acquiesced in the procedure when they refused to select new fillers.

428.    Based on this identification, a grand jury, which was not informed of the suggestiveness of the lineup, indicted Benitez.

429.    Benitez was convicted and spent almost six years in prison before his conviction was reversed and he was acquitted on retrial.

430.    The aforementioned policies, customs and/or practices of the NYPD and the HAPD regarding, and policymakers' deliberate indifference to, *Brady* violations, false identifications, coercion of false testimony, and false charges and convictions, directly, foreseeably, proximately, and substantially caused the violations of Mr. Kendrick's federal constitutional rights in this case and his resulting injuries.

431.    Under the principles of municipal liability for federal civil rights violations, the City's and NYCHA's Police Commissioners (or their authorized delegates) had final responsibility for training, instructing, supervising, and disciplining police personnel with

respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses, the conduct of identification procedures, the initiation of criminal prosecutions, and the disclosure of *Brady* material.

432.   The Police Commissioners, personally and/or through their authorized delegates, at all relevant times had final authority, and constituted policymakers for whom the City and NYCHA are liable, with respect to compliance by police employees with the above-mentioned constitutional requirements.

433.   During all times material to this Complaint, the Police Commissioners owed a duty to the public at large and to Mr. Kendrick, which they knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, practices, training, and discipline sufficient to prevent or deter conduct by their subordinates violating the constitutional rights of criminal suspects or defendants and of other members of the public.

434.   The aforesaid policies, procedures, regulations, practices and/or customs of the Police Departments of Defendants City and NYCHA were collectively and individually a substantial factor in bringing about the aforesaid violations by the Individual Police Defendants of Mr. Kendrick's rights under the Constitution and laws of the United States.

435.   By virtue of the foregoing, Defendants City of New York and NYCHA are liable for the jointly undertaken misconduct of NYPD and NYCHA detectives which caused Mr. Kendrick's wrongful prosecution and conviction and all his resultant damages.

## SEVENTH CAUSE OF ACTION
### *Monell* Liability for the Policies, Practices, and Customs of the
### Queens County District Attorney's Office Under 42 U.S.C. § 1983
### Defendant the City of New York

436.   Plaintiff repeats and realleges each allegation contained in ¶¶ 1-251 as if fully set forth herein.

437.   The violations of Mr. Kendrick's constitutional rights to due process and a fair trial by trial prosecutor Quinn, including but not limited to those set forth above in ¶¶ 159-217, wholly or substantially resulted from the unlawful policies, customs, and practices of the Queens County District Attorney's Office ("QCDAO"), for which the District Attorney, as chief policymaker for the Office, was responsible.

438.   Prior to Mr. Kendrick's arrest and trial, policymaking officials at the QCDAO, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of prosecuting and convicting innocent people, and to the rights of all criminal suspects and defendants to due process and a fair trial, implemented the following illegal or inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline with respect to prosecutors:

a.   Deliberately structuring deals with and promises to cooperating witnesses in a manner designed to improperly conceal the full extent of the benefits such witnesses stood to receive in exchange for their testimony favoring the prosecution;

b.   Making false, misleading, and incomplete disclosures of *Brady* material, including but not limited to exculpatory evidence and impeachment information;

c.   Delaying disclosure of such information until it was too late for the defense to make adequate use of it;

    d.     Using state procedural rules to frustrate federal constitutional requirements for prompt and full disclosure of the bad acts, illegal behavior, and motives to lie of prosecution witnesses;

    e.     Eliciting, and/or failing to correct, false, incomplete, or materially misleading testimony and evidence;

    f.     Participating in and/or utilizing at trial unduly suggestive, manufactured lineup identification "evidence"; and

    g.     Frustrating criminal defendants' constitutional right to a fair trial through false, misleading, inflammatory, or otherwise improper summation advocacy.

439.    The aforesaid deliberate or de facto policies, procedures, regulations, practices and/or customs, including the failure to properly instruct, train, supervise, and/or discipline employees with regard thereto, were implemented or tolerated by policymaking officials for Defendant City, including, but not limited to, the D.A. and his delegates, who knew:

    a.     to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

    b.     that such issues may present employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;

    c.     that employees facing such issues have strong incentives to make the wrong choices, especially given the pressure the D.A.'s Office places on prosecutors to win convictions at any cost;

    d.     that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of the accused and cause him constitutional injury; and

    e.     that employees of the D.A.'s Office had a history of making wrong choices in such matters.

440.  The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon:

   a.  numerous credible allegations, many substantiated by judicial decisions (some of which are listed in Exhibit A, which is incorporated herein by reference, or discussed below) that Queens County ADAs had:

      i.  participated in the manufacturing of false testimony or evidence, including identification evidence;

      ii.  presented or failed to correct false or misleading testimony and argument;

      iii.  failed to disclose information favorable to the defense that was required to be disclosed by the constitutions and the laws of the United States and of the State of New York; and

      iv.  made arguments at trial that were so false, misleading, or otherwise improper that they deprived the defendant of due process and a fair trial; and

   b.  the inherent obviousness of the need to train, supervise, and/or discipline ADAs in the above constitutional obligations to counteract the pressure that the D.A.'s Office applied to prosecutors to obtain convictions.

441.  During all times material to this complaint, the City, through its policymaker, the Queens District Attorney, owed a duty to the public at large and to Mr. Kendrick to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by subordinates that violate the constitutional rights of criminal suspects or defendants and of other members of the public.

442.  The D.A.'s policies, customs, and/or practice of approval, ratification of, or deliberate indifference to, violations by Queens prosecutors of their constitutional obligations to afford criminal defendants a fair trial, foreseeably encouraged such

70

violations to continue and was a substantial cause of ADA Quinn's violations of Mr. Kendrick's constitutional rights before and during his trial, of Mr. Kendrick's wrongful conviction, and of the continuation thereafter of his wrongful imprisonment and prosecution.

443.    ADA Quinn was trained, gained experience, and rose to a supervisory level, under District Attorney John Santucci.

444.    Santucci had no training programs, no *Brady* disclosure or fair trial policies, no information management system to track and ensure disclosure of *Brady* material, no written trial manual, and no disciplinary system.

445.    Under his stewardship, the office deliberately compartmentalized information, including information required to be disclosed to the defense under *Brady,* knowing that the result would be the denial to numerous criminal defendants of their constitutional right to a fair trial.

446.    Indeed, the Office trained ADAs in a "Chinese Wall" policy under which cooperation agreements were made with prosecution witnesses without the assigned prosecutor using the witness's testimony actually knowing the details.

447.    Under this system, witnesses would give false or incomplete descriptions of their cooperation agreements and expectation of benefits and the prosecutor would not correct their testimony, causing juries to be misled.

448.    The Santucci "Chinese Wall" policy was exposed, while he was still in office, during the joint trial of co-defendants Gary Steadman and Raymond Blair in 1990.

449.    A key prosecution witness, Tony Malloy, testified to limited benefits he had received from the QCDAO but denied that prosecutors had promised him leniency with respect to several of his pending felonies for which he was facing a lengthy period of imprisonment.

450.    Later in the trial, the defense learned that his testimony was false.

451.    In fact, Dan McCarthy, the chief of Santucci's Trial Division, outside the presence of the assigned trial prosecutors, had promised Malloy's attorney that, in exchange for favorable testimony, Malloy could avoid prison altogether.

452.    When the defense then called Malloy's attorney to testify, he acknowledged the deal, but refused to testify whether he had communicated it to his client, citing attorney-client privilege.

453.    McCarthy had deliberately structured the deal this way so that neither Malloy nor his attorney could be examined about the benefits Malloy expected to receive.

454.    But for the leak to the defense attorneys, the deal never would have been discovered at all.

455.    Ruling on the defense's motion for a mistrial or dismissal, the trial court found that the deal was "deliberately not communicated from the executive level of the Queens District Attorney's Office to the trial attorneys." The court denounced the "Chinese Wall" policy and directed that it be discontinued:

> [T]his court cannot adequately express in words its disgust that the trial was impacted by a shabbily structured cooperation charade. . . .
>
> Any reasonable interpretation of what happened here must conclude that . . . the executive level of the of the Queens District Attorney's

Office improperly attempted to shield a witness from "*Brady*" evidence disclosure . . . . *It is hoped that this . . . will never again be attempted . . . .* [emphasis added]

456.    The trial court nevertheless denied the defense motion since the jury had eventually learned, through the testimony of the defense attorney, of the promises that had been made to him to benefit his client.

457.    Richard Brown succeeded John Santucci as D.A. in 1991, after the trial court's decision but before any appellate decision.

458.    However, Brown argued to the Appellate Division that the prosecutors had done nothing wrong.

459.    This argument communicated to ADAs that the new regime would tolerate the same old illegalities because all that mattered was winning or preserving the conviction.

460.    Rejecting Brown's position, the Appellate Division "share[d] the trial court's condemnation of the tactics employed" by the QCDAO.   However, it affirmed the conviction for the same reason as the trial court – that the defendant had not been sufficiently prejudiced by the misconduct to warrant a new trial. *People v. Blair*, 186 A.D.2d 665, 668 (2d Dep't 1992), *rev'd sub nom. People v. Steadman*, 82 N.Y.2d 1 (1993).

461.    The Court of Appeals, however, ordered a new trial.

462.    It ruled that "the scheme employed by the District Attorney's office," which revealed "a determined effort . . . to avoid" its *Brady* obligations, "undermine[d] the purposes of the *Brady* and [related state] rules" and "cannot be condoned."   *Steadman*, 82 N.Y.2d at 6-7.

463.    The Court of Appeals decision condemned not only McCarthy, who had left the Office, but also the line prosecutors, who were still there, for having closed their eyes to the deal and failing to disclose it.

464.    However, Brown did not investigate the conduct of the line prosecutors or discipline them.

465.    The prosecutors remained in the Office and received raises and promotions.

466.    Brown adopted no formal or written *Brady* manual, standards, or procedures, no disciplinary system, and no remedial training for the prosecutors who had been corrupted under Santucci.

467.    Moreover, Brown allowed the practice of structuring cooperation agreements in a manner that would deny full disclosure to the defense to continue.

468.    In 1992, Brown's office tried Shih Wei Su for attempted murder in connection with a shooting at a pool hall in Bayside, Queens.

469.    At the trial, a crucial prosecution witness falsely denied, under questioning by the prosecutor, that he had received any leniency in exchange for his testimony accusing Su.

470.    The prosecutor, Linda Rosero, had been trained in the "Chinese Wall" policy under Santucci.

471.    Rosero was not present when another ADA agreed during a sealed court proceeding to the witness receiving the lenient deal, and she failed to learn the details.

472.    Rosero not only failed to correct the witness's false testimony, but then falsely vouched for the truthfulness of the witness's testimony in her summation, arguing the witness had no motive to lie.

473.    She also suppressed that a second witness had tried to bribe her to assist him in suing the pool hall where the shooting had occurred and had offered to "come up" with more witnesses.

474.    Su was convicted of attempted murder and sent to state prison.

475.    In 1998, a state judge, over the District Attorney's vigorous opposition, directed the disclosure of a sealed plea transcript involving the first witness.

476.    The transcript revealed the secret deal, offered by another prosecutor, that the witness had received in exchange for his testimony against Su.

477.    For years, after the truth had been revealed, Brown's Office raised one technical legal argument after another to successfully resist Su's efforts to overturn his fraudulently obtained conviction.

478.    Finally, the United States Court of Appeals for the Second Circuit ordered a rare grant of a federal writ of *habeas corpus*, overturning Su's conviction and directing his retrial or release.

479.    The court condemned Su's prosecutor for having "knowingly elicited false testimony from a crucial witness," *Su v. Filion*, 335 F.3d 119, 121 (2d Cir. 2003), whose "credibility could not help but be central to the deliberations of any reasonable jury," *id.* at 129, and then "bolster[ing that witness's] credibility" in a false summation, *id.* at 125.

480.    Su had suffered 12 years in prison.

481.   Policymakers at the QCDAO were not the least bit disturbed by the prosecutor's behavior or the Second Circuit's condemnation of it.

482.   After learning of the Second Circuit's opinion, Su's prosecutor Rosero spoke with D.A. Brown's second-in-command, Chief Assistant D.A. John Ryan, to complain that no one had warned her of the decision.

483.   Ryan told her, "[Y]ou are just going to have a bad day, that's all."

484.   Another high-level prosecutor in the office told her, "Don't worry, you're a good attorney. Everything will work out."

485.   Su then recovered a multi-million-dollar civil settlement.

486.   Brown's office also defended the conduct of prosecutors in two additional "Chinese Wall" cases that were reversed on appeal, *People v. Gaines,* 199 A.D.2d 335 (2d Dep't 1993), and *People v. May,* 228 A.D.2d 523 (2d Dept. 1996).

487.   The same prosecutor, John Scarpa, had handled these two cases.

488.   He was not disciplined either.

489.   The Office's policy and practice of walling off trial prosecutors from knowledge of impeachment evidence continued in the Kareem Bellamy murder case tried the same year as Mr. Kendrick, in 1995.

490.   Bellamy was convicted after another Santucci-trained prosecutor, David Guy, failed to disclose thousands of dollars in housing and meal payments that had been made or promised to a witness to induce her cooperation.

491.    The knowledge and records of these promises and benefits were kept in a witness protection file that was maintained by another bureau in the office and wasn't made available to ADA Guy.

492.    Bellamy served 14 years in prison before his conviction was overturned, and he later recovered $8 million from New York City.

493.    In or about 1999, two high-level supervisors in the Office, Brad Leventhal and Charles Testagrossa, handled a murder prosecution of three defendants, Rohan Bolt, George Bell, and Gary Johnson, who were separately tried for the same murder.

494.    At Bell's trial, the Office sought the death penalty.

495.    Nevertheless, at each of the trials, the prosecutors failed to disclose evidence, in the possession of another bureau of the Office, pointing towards unrelated individuals as responsible for the murder.

496.    Leventhal and Testagrossa blamed the Office's bureau structure, under which prosecutors in one bureau did not have knowledge of evidence known to other bureaus.

497.    The improper and unlawful walling-off practice, and policymakers' indifference to it, continued through at least 2000.   In that year, a Santucci-trained prosecutor, Deborah Pomodore, failed to correct the false testimony of a crucial cooperating witness that he hadn't received any financial payments or benefits from the Office when in fact he had received several thousand dollars of direct cash payments, documented in signed receipts, and more than $16,000 for hotel charges.

498.   It took 12 years before Bedi finally succeeded in compelling the District Attorney's office, through a FOIL lawsuit, and over its resistance, to reveal its witness relocation file for this witness, and his conviction was then overturned.

499.   District Attorney Brown was well aware of the pervasive misconduct of the QCDAO, including *Brady* violations, summation misconduct, and other infringements on defendants' constitutional fair trial rights, when he became D.A. in 1991, and of the need to take strong measures to change the rancid culture of the Office.

500.   Brown had served as a justice of the Appellate Division, Second Department, from March 1981 until 1991.

501.   There were numerous decisions by his court, many of which he had written or participated in, during the period preceding his initial term as District Attorney.

502.   Thirty-three of these decisions, from the period 1985 through 1990, are listed in Exhibit A, which is incorporated herein by reference.

503.   These decisions were so numerous and so strongly worded that they suggested the existence of an anything-goes culture and practice aimed at obtaining convictions no matter the cost to criminal defendants' constitutional rights.

504.   Nevertheless, upon becoming D.A. himself in 1991, Brown, through his deliberate indifference, permitted this culture to continue.

505.   He did so by failing to conduct internal disciplinary investigations or to discipline the prosecutors who were known to commit such violations, failing to refer such individuals for possible discipline by the Appellate Division's Disciplinary or Grievance Committees, and failing to ensure they were properly trained and supervised.

506. Instead of disciplining prosecutors who were found to have violated the constitutional rights of criminal defendants to a fair trial, District Attorney Brown's policy, custom, or practice was to give these prosecutors positive evaluations, raises, promotions, and commendations, based in part on their record of winning at trial and extracting guilty pleas, even in weak cases, while ignoring or discounting judicial findings of misconduct by these prosecutors.

507. No investigation would be made of bureau chiefs and deputy bureau chiefs who permitted line prosecutors under their supervision to continually violate the rights of criminal defendants. Supervisors weren't trained in how to supervise.

508. The practice of structuring agreements with witnesses in a manner designed to frustrate defendants' *Brady* disclosure rights continued.

509. Under Santucci, and continuing under Brown, the Office maintained listings of the won-loss trial records of prosecutors and even would rank them.

510. Some of the worst violators were the supervisors themselves, which obviously gave the wrong message to others in the Office.

511. ADA Beverly Kalman was made a supervisor in the so-called "Training Bureau" even though, in *People v. Clausell,* 182 A.D.2d 132, 134-36 (2d Dept. 1992), a conviction she obtained was vacated because she had failed to disclose a "buy report" in a narcotics case that gave a description of the seller that was wholly inconsistent with the appearance of the defendant.

512. This decision followed by a year the Appellate Division's decision in *People v. Stevens,* 174 A.D.2d 640, 640 (2d Dept. 1991), in which she was criticized for her

improper "attempt to convey to the jury, by insinuation, suggestion or speculation, the impression that defendant was guilty of other crimes not in issue at trial."

513.   ADA Kevin Durant was appointed a training bureau supervisor in 1995 even though, in *People v. Moss,* 215 A.D.2d 594, 594 (2d Dept. 1995), the Appellate Division reversed a conviction Durant obtained in 1992 under District Attorney Brown due to, among other things, his "numerous references to the defendant as a violent person" and his "comparison between the defendant and the character 'Hannibal Lecter' in the film 'Silence of the Lambs'…"

514.   The *Moss* decision followed two other decisions which criticized Durant for summation misconduct, *People v. Bradley,* 199 A.D.2d 327 (2d Dept. 1993), and *People v. Fanfan,* 207 A.D.2d 907 (2d Dept. 1994).

515.   The Office's policy of indifference to misconduct was further shown in 1996, following an appellate argument in which a highly respected Justice, Myriam Altman, was incensed by the prosecutor's summation and the Office's defense of it.

516.   Justice Altman complained to the Office, just as other judges had done before her.

517.   Chief Assistant Barry Schwartz commissioned a study that revealed dozens of misconduct decisions and allegations, many still pending, for summation misconduct and discovery violations.

518.   However, the study had no impact:  it resulted in no change in policies, practices, procedures, supervision, or discipline.

519.   Brown's indifference to misconduct was shown by his continual failure to take any remedial measures when he learned of misconduct of prosecutors on his staff.

520.   Perhaps the worst example of this was his handling of the infamous prosecutor, Claude Stuart.

521.   In 1994, Stuart tried Jay Walters for murder.

522.   According to the Appellate Division's decision reversing Walters' conviction, during his summation, Stuart held up a gun that he claimed the defendant had used in the murder when he *knew* it had been definitively established it was not the murder weapon. *See People v. Walters,* 251 A.D.2d 433 (2d Dept. 1998).

523.   Stuart repeatedly called the defendant a liar, repeatedly gave his own opinion and vouched for his witnesses' credibility, improperly tried to shift the burden of proof to the defendant, and made purposefully inflammatory remarks.

524.   The Appellate Division's decision was stunning in its harshness about Stuart's misconduct.

525.   It became notorious in the Office – many prosecutors were talking about it.

526.   One of Brown's most respected supervisors, Robert Masters, approached Brown's new chief assistant, John Ryan, who was in charge of managing the Office's personnel, to express his concern that Stuart was a terrible prosecutor and a risk to the Office.

527.   Brown, himself, after reading the decision, sent it to Ryan with an extraordinarily revealing note saying: "Jack, Let's discuss how to handle – *I think we've*

*been getting away with this kind of stuff a long time"* (emphasis added) ("the Brown Memo").

528.   Ryan promised Masters that Stuart would be closely supervised.

529.   However, then, despite Brown's note, and with Brown's approval, Ryan *promoted* Stuart to the elite Homicide Bureau.

530.   The Homicide Bureau chief was known for providing no supervision at all.

531.   Brown and Ryan then gave Stuart substantial raises.

532.   He continued to try murder cases without supervision.

533.   In 2003, the Legal Aid Society moved to overturn a murder conviction, in *People v. Johnson,* Ind. No. 2002/2000.

534.   Stuart had obtained the conviction by lying to the judge about the whereabouts of an exculpatory witness.

535.   Opposing the Legal Aid motion, Brown's office *defended* the conviction and asked that the motion be squelched without a hearing.

536.   Only when a TV reporter exposed the sordid affair did Brown then reverse course, agree to vacate the conviction, and ultimately ask the prosecutor to resign.

537.   Thereafter, Brown and his executives would use the Stuart case – an egregious misconduct case they had tried to cover up – as an example of how "seriously" they took the disciplining of prosecutors.

538.   Stuart, by this time, had several other murder or serious felony convictions under his belt which had been or would shortly be reversed for his misconduct.  *See Farakesh v. Artuz,* No. 99 Civ. 3945, 2000 WL 1480896, at *11 (E.D.N.Y. Oct. 3, 2000)

(vacating conviction on federal habeas corpus review for Stuart's "flagrant" due process violations); *People v. Jamal,* 307 A.D.2d 267 (2d Dept. 2003); *People v. McCall,* 5 A.D.3d 608 (2d Dept. 2004).

539.   Stuart was the first, and only, prosecutor to be punished for *Brady* violations or summation misconduct during the first 15 years of Brown's tenure.

540.   Meanwhile, for more than 20 years, Brown, Ryan, and their underlings suppressed the Brown Memo, which was contained in Ryan's personal files.

541.   Various lawsuits including the Su case and others alleging D.A. Brown's deliberate indifference to prosecutorial misconduct, had sought disclosure of all evidence showing Brown's awareness of misconduct and failure to act against it.

542.   Nevertheless, the Brown Memo was not disclosed until 2021, after Brown and Ryan had been succeeded by a new District Attorney.

543.   Indeed, Ryan was closely questioned, during Ryan's two full days of deposition testimony in 2019-20 in the Kareem Bellamy case, about Brown's and his response to Claude Stuart's handling of the *Johnson* case and Brown's practice of writing notes about individual court decisions that came to his attention, but he did not reveal the existence of the Brown Memo.

544.   Why this crucial document was never previously disclosed by Brown, Ryan, or the New York City Law Department has never been explained.

545.   Mr. Kendrick's prosecutor, Quinn, as Chief of the Trial Division beginning in 1991, was one of the three most powerful executives in the Office under Brown.

546.    He was a policymaker for Brown with respect to the conduct of felony trials by prosecutors in the Office.

547.    As such, his behavior in Mr. Kendrick's case amounted to Office policy or, at the very least, was a manifestation of Office policy.

548.    Quinn was not the only high-level supervisor in the QCDAO during the 1990s to commit egregious *Brady* violations.

549.    In the aforementioned Bell/Johnson/Bolt case in 1999-2000, two supervisors, Charles Testagrossa and Brad Leventhal, suppressed powerful evidence pointing to other perpetrators of a murder. In one of these cases, the Office sought the death penalty.

550.    That two such high-level homicide prosecutors would deliberately suppress such powerful exculpatory evidence in a *death penalty case* was telling evidence of the policies and mentality of the Office.

551.    The convictions were finally overturned, more than 20 years later, by the new District Attorney, Melinda Katz.

552.    Exhibit A lists and summarizes 84 court decisions (numbers 34-117) that were handed down during Mr. Brown's tenure as D.A. from 1991 through 2017.

553.    These decisions found that Queens prosecutors, as in Mr. Kendrick's case, had wrongfully withheld favorable information from the defense, used or failed to correct false or misleading evidence or argument, or engaged in misconduct, often pervasive, during summations.

554.    Upon information and belief, except for the aforementioned *Johnson* case, none of the prosecutors responsible for the misconduct in these cases were disciplined.

555.    The D.A.'s failure to take any reasonable measures to discipline prosecutors responsible for such constitutional violations incentivized them and their colleagues to continue to violate the constitutional rights of criminal defendants.

556.    Prosecutors knew they were likely to be rewarded for winning but would suffer no negative personal consequence in the unlikely event their misconduct was exposed.

557.    Further leading to the manufacturing and use of coerced or unreliable evidence was the QCDAO's practice, as in Mr. Kendrick's case, of improperly influencing lineup identifications and knowingly using unlawfully obtained lineup "evidence" in criminal proceedings.

558.    During the 1994 lineup involving the above-mentioned murder defendant, Kareem Bellamy, an eyewitness failed to positively identify Bellamy.

559.    Just like in Mr. Kendrick's case, a Queens ADA, Stephen Antignani, was present at the lineup to supervise it and, in theory, to ensure it was conducted fairly.

560.    Knowing that, without a positive identification, there would be an insufficient basis to obtain an indictment, Antignani permitted a detective to take the witness into a private room, where the two talked privately.

561.    After the witness and the detective emerged from the room, the witness suddenly claimed to be able to positively identify Bellamy.

562.    ADA Antignani used this manufactured "identification" in the grand jury to obtain an indictment and at the trial to obtain a conviction.

563.    This was similar to the way the identification was obtained from Rogers in Mr. Kendrick's case and then used against Mr. Kendrick at trial.

564.    In 2005, during the investigation of a Queens shooting, an eyewitness, when viewing suspect Julio Negron, said "I think" or "I believe" that's the shooter, but did not make a positive identification.

565.    A Queens ADA, Patrick O'Connor, then participated with detectives in a 15-minute, closed-door meeting with the witness, which resulted in him changing his mind and claiming his identification was positive.

566.    Negron spent nearly 10 years in prison before the New York Court of Appeals reversed his conviction and, afterwards, he obtained a $6.25 million settlement from New York City.

567.    Similarly, in the Ricardo Benitez case, in 2009, a prosecutor attending a lineup to ensure its fairness, Tina Grillo, knew the lineup was grossly suggestive but allowed it to go forward.

568.    While the suspect was in his 50s and appeared gaunt, sickly, and disheveled, the fillers were all clean-cut, lighter-skinned policemen who were 15 to 20 years younger.

569.    Even though records of the QCDAO described the lineup as "terrible," a prosecutor still used it to obtain an indictment.

570.    The grand jury was informed only of the identification, not of the extraordinarily suggestive and unlawful circumstances by which it was obtained.

571.    Thereafter, a prosecutor misled a hearing judge into allowing an in-court identification at trial by introducing untrue testimony from the witness that her initial

observation of the suspect had lasted five minutes, when a surveillance video showed it had really lasted a matter of seconds.

572.  Benitez was convicted and spent almost six years in prison before his conviction was reversed and he was acquitted at a retrial.

573.  The Queens D.A., as well as subordinates to whom he delegated policymaking, managerial and administrative authority, at all relevant times constituted City policymakers for whom the City is liable.

574.  The County of Queens is a subdivision of Defendant City of New York.

575.  The D.A., at all relevant times, was and is an elected officer of Queens County.

576.  The D.A.'s Office was and is funded out of the City's budget.

577.  The D.A. was and is designated a "local officer," rather than a "state officer," under New York Public Officers Law § 2.

578.  The D.A. and his assistant district attorneys are agents and employees of Defendant City of New York.

579.  The State of New York has provided by statute that Defendant City's constituent counties (including Queens County), and hence Defendant City itself, are liable for torts committed by County officers and employees, such as the D.A. and his assistants. *See* N.Y. County Law §§ 53, 941.

580.  The City represents such officers and employees in judicial proceedings and indemnifies them because they are City officials.

581.    Under the principles of municipal liability for federal civil rights violations, the D.A. or his authorized delegates have final managerial responsibility for training, instructing, supervising, and disciplining attorneys and other employees of the D.A.'s Office regarding their conduct in the prosecution of criminal matters, including, but not limited to:

      a.     their constitutional obligation not to create or to otherwise use false, misleading, or unreliable evidence, testimony, statements, or argument during criminal proceedings, including but not limited to manufactured lineup identifications and in-court identification testimony;

      b.     their constitutional obligation to correct evidence, testimony, statements, and argument that they know or should know is false, inaccurate, incomplete, misleading, or unreliable;

      c.     their constitutional obligation not to make improper argument during summations that deny a defendant his right to a fair trial; and

      d.     their continuing constitutional obligation to timely and fully disclose material evidence and information favorable to the defense as set forth in *Brady*, *Giglio v. United States,* and their progeny.

582.    As alleged above, the Queens D.A. and his authorized delegates maintained a policy, custom, or practice, at the time of Mr. Kendrick's criminal prosecution and through the end of the tenure of District Attorney Richard Brown and Acting District Attorney John Ryan, of deliberate indifference to violations by QCDAO employees of their constitutional fair trial obligations.

583.    They did so despite their obligation to set an ethical tone for the Office and to make reasonable efforts to ensure that all personnel in the Office acted ethically and in compliance with the law.

584. They did so despite their awareness that the failure to discipline unethical behavior can poison the atmosphere of the entire office.

585. Despite a shocking history of fair trial violations by prosecutors, the D.A. and his executive staff allowed unlawful policies, customs, and practices to continue, failed to adopt minimally adequate policy and procedural manuals or bulletins, failed to require adequate training or supervision, failed to adopt any disciplinary standards or procedures, and failed to investigate or discipline known and often startling violations of defendants' rights to due process and a fair trial.

586. This deliberate indifference created a win-at-all-costs culture in which prosecutors were encouraged to do virtually anything they could get away with to achieve convictions.

587. This culture in turn led to even more constitutional violations and improperly obtained convictions, including the conviction of Jaythan Kendrick.

588. By virtue of the foregoing, Defendant City is liable for having substantially caused the foregoing violations of Mr. Kendrick's constitutional rights and his resultant injuries.

## EIGHTH CAUSE OF ACTION
### Negligent Hiring, Training, and Supervision Under New York Law
### Defendants the City of New York and New York City Housing Authority

589. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

590. During all times material to this Complaint, Defendants City of New York and NYCHA, through their policymakers, owed a duty to the public at large and to Mr.

Kendrick, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates, including police detectives and assistant district attorneys acting in their investigatory capacity, violating the aforementioned constitutional rights of criminal suspects or defendants and other members of the public.

591.    Defendant City of New York and New York City Housing Authority are liable because of their negligent failure to adequately hire, train, supervise, and discipline their agents, servants, and/or employees with regard to their aforementioned duties, and because such negligence was a substantial and foreseeable cause of the injuries that Mr. Kendrick suffered.

## DEMAND FOR DAMAGES

592.    Mr. Kendrick's injuries and damages include, but are not limited to:

    a.  His wrongful prosecution and conviction for murder and related charges;

    b.  His loss of liberty for more than 26 years;

    c.  The loss of the services, society, companionship, and consortium of his family and friends;

    d.  Past mental and emotional suffering and inadequate treatment therefor;

    e.  Physical injuries and illness and inadequate treatment therefor; and

    f.  Lost employment income in an amount to be calculated by an economist.

WHEREFORE, Plaintiff Estate of Jaythan Kendrick demands judgment against the Defendants as follows:

a.    damages for lost income in an amount to be determined;

b.    additional compensatory damages of not less than $80,000,000;

c.    punitive damages against the Individual Defendants of not less than $20,000,000;

d.    reasonable attorneys' fees, together with costs and disbursements, under 42 U.S.C. § 1988 and the inherent powers of this Court;

e.    pre-judgment interest as allowed by law; and

f.    such other and further relief as this Court may deem just and proper.

Yours, etc.,

/s/ Joel B. Rudin
JOEL B. RUDIN, Esq.
Law Offices of Joel B. Rudin, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com

/s/ Thomas Hoffman
THOMAS HOFFMAN, Esq.
Law Office of Thomas Hoffman
37 Elaine Terrace
Yonkers, New York 10701
(212) 581-1180
thoff93452@aol.com

/s/ Michael L. Bloch
MICHAEL L. BLOCH, Esq.
BENJAMIN D. WHITE, Esq.
Bloch & White LLP
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 702-8670
mbloch@blochwhite.com
bwhite@blochwhite.com

*Attorneys for Plaintiff*

Dated:     New York, New York
            April 14, 2023

# EXHIBIT A

1.   *People v. Roopchand*, 107 A.D.2d 35 (2d Dep't 1985): Affirming conviction but unequivocally condemning trial prosecutor for making inflammatory summation argument intended to elicit sympathy for the complainant and arouse animosity against the defendant and warning the prosecutor that future infractions may lead to disciplinary action, and that the court expected the Queens County D.A. to issue an appropriate internal admonition.

2.   *People v. Jones*, 108 A.D.2d 824 (2d Dep't 1985): Reversing robbery conviction where, among other things, the prosecutor improperly elicited that the defendant had previously hit a woman with a bat, and then suggested on summation that the jury could never believe a man who had done this.

3.   *People v. Valdivia*, 108 A.D.2d 885 (2d Dep't 1985): Affirming conviction but "strongly condemn[ing]" prosecutor for improperly cross-examining alibi witness regarding his taking an affirmation instead of an oath and revisiting the matter in summation, and for characterizing defendant's testimony as "an out and out series of lies."

4.   *People v. Hooks*, 110 A.D.2d 909 (2d Dep't 1985): Reversing conviction for rape, robbery, and burglary where prosecutor cross-examined defendant on his prior conviction in such a way as to improperly create the inference that because defendant had previously committed a burglary, he had also committed the instant offenses.

5.   *People v. Brown*, 111 A.D.2d 248 (2d Dep't 1985): In reversing conviction on other grounds, reprimanding prosecutor for making comments during summation that characterized defendant as lying while characterizing the prosecution as "on the side of truth," and implying that the jury should convict even if not convinced beyond a reasonable doubt, so long as it believed its verdict represented the "truth."

6.   *People v. Torres*, 111 A.D.2d 885 (2d Dep't 1985): Reversing, in part, because prosecutor repeatedly cross-examined alibi witness on why the witness did not contact the police, improperly implying witness was obligated to come forward, and because prosecutor consistently implied during summation that defense had concocted alibi, and improperly suggested that the jury would be subject to derision if they acquitted defendant.

7.   *People v. Williams,* 112 A.D.2d 177 (2d Dep't 1985): In reversing, reprimanding trial prosecutor for intimating to jury during summation that they were required to find that the complainant had lied in order to acquit defendant, and improperly bolstering by injecting his integrity and the integrity of his office into the case.

8. *People v. Hines,* 112 A.D.2d 316 (2d Dep't 1985): Reversing in part because the prosecutor, during his summation, made inappropriate comments about the defendant, and emphasized the other "police procedures" which led to the selection of defendant as a suspect, clearly inviting the jury to infer that there was other evidence against defendant, of which they had not been told.

9. *People v. La Rosa,* 112 A.D.2d 954 (2d Dep't 1985): Reversing conviction where the prosecutor, in summation, improperly vouched for his own case, denigrated the defense, misrepresented material facts, and misquoted testimony.

10. *People v. Reyes*, 119 A.D.2d 596 (2d Dep't 1986): Affirming conviction but noting that prosecutor improperly told jury that "contrary to what the Defense Counsel would have you believe, a trial is not a search for reasonable doubt. Plainly simply a trial is a search for truth. Not supposed to be sitting here trying to pick reasonable doubt out from everything that goes on [sic]."

11. *People v. Mercado*, 120 A.D.2d 619, 502 N.Y.S.2d 87 (2d Dep't 1986): Ordering new trial where, among other errors, court allowed prosecutor to admit photograph of defendant posing with handguns for no other purpose than to arouse jurors' emotions, and inflammatory nature of photographs was made worse when prosecutor, in summation, commented on jury having seen defendant in his "Al Capone get-up."

12. *People v. Pascullo*, 120 A.D.2d 687 (2d Dep't 1986): Reversing conviction in part because prosecutor suggested improper inferences of racial motivation and informed the jury that an acquittal would be a condonation of racism.

13. *People v. Beaman*, 122 A.D.2d 848 (2d Dep't 1986): Reversing conviction because prosecutor called witness to stand knowing he would refuse to testify, and improperly commenting on this refusal during summation, thereby inviting jury to speculate that witness had been threatened and refused to testify out of fear.

14. *People v. Ciervo*, 123 A.D.2d 393 (2d Dep't 1986): Reversing conviction in part because of prosecutor's improper summation comments implying that a conviction was warranted based solely upon the defendant's character, and repeated characterizations of the defense case as a "con."

15. *People v. Roudabush*, 123 A.D.2d 649 (2d Dep't 1986): Affirming conviction but "condemn[ing]" prosecutor's misconduct during summation and noting that court made its position on this misconduct "quite clear" during oral argument.

16. *People v. Anderson*, 123 A.D.2d 770 (2d Dep't 1986): Reversing conviction because prosecutor re-called witness (who had originally been a codefendant in the case) to the stand, even though prosecutor knew the witness was going to invoke his

2

privilege against self-incrimination, and improperly commented several times on this invocation of privilege during summation, thus inviting jury to draw an unwarranted inference against the defendant.

17. *People v. Brown*, 125 A.D.2d 321, 510 N.Y.S.2d 135 (2d Dep't 1986): Reversing conviction because prosecutor improperly bolstered victim's testimony by implying that the defendant's stipulation that the victim had been raped and sodomized was a stipulation that the victim had told the truth, and by telling the jury something was "terribly wrong" with them if they did not believe the victim.

18. *People v. Montalvo*, 125 A.D.2d 338 (2d Dep't 1986): Reversing conviction where prosecutor, in his summation, improperly commented upon the defendant's failure to testify and to call witnesses on his own behalf.

19. *People v. Napoli*, 126 A.D.2d 674 (2d Dep't 1987): Affirming conviction but noting that prosecutor "went beyond the four corners of the evidence" in summation.

20. *People v. Faison*, 126 A.D.2d 739 (2d Dep't 1987): Ordering new trial where prosecutor improperly cross-examined accused (1) on his failure to disclose alibi to police after being given *Miranda* warnings, and (2) on his failure to produce records indicating that he was at work at time of robbery, which suggested that defendant bore burden of proving alibi defense.

21. *People v. Memminger*, 126 A.D.2d 752 (2d Dep't 1987): Ordering new trial on various grounds and "admonish[ing]" prosecutor "to remain within the bounds of fair comment during summation and to refrain from inappropriate and inflammatory remarks."

22. *People v. Perez*, 127 A.D.2d 707 (2d Dep't 1987): Ordering new trial where, among other things, prosecutor improperly implied on cross-examination of accused that he was involved in previous criminal activity.

23. *People v. Simms*, 130 A.D.2d 525 (2d Dep't 1987): Ordering new trial because of "numerous instances of prosecutorial misconduct which occurred throughout the course of the trial," including prosecutor's (1) eliciting of testimony that had been suppressed, (2) referring to that same evidence during summation, (3) repeatedly referring to facts not in evidence, (4) calling defendant's summation a "fairy tale," and (5) vouching for witnesses' credibility.

24. *People v. Scoon*, 130 A.D.2d 597 (2d Dep't 1987): Ordering new trial where prosecutor improperly (1) argued in summation that witness was not involved in crimes of dishonesty when he knew that the witness had a youthful-offender adjudication for grand larceny, and (2) repeatedly commented on matters not in evidence during summation.

3

25.   *People v. Torriente*, 131 A.D.2d 793 (2d Dep't 1987): Ordering new trial where prosecutor improperly (1) cross-examined shooting victim about drug use, (2) cross-examined defendant on whether he had entered country illegally, (3) called police officer to introduce irrelevant testimony about defendant's place of residence, and (4) made prejudicial statements in summation about defense counsel's summation and witnesses' testimony.

26.   *People v. Romain*, 137 A.D.2d 848 (2d Dep't 1988): Ordering new trial in part based on prosecutor's "gross distortion" in summation of defendant's testimony, implying that he had admitted guilt when in fact he had not.

27.   *People v. Chin*, 138 A.D.2d 389 (2d Dep't 1988): Ordering new trial where prosecutor improperly made unwarranted inferences in summation that defendant accused of rape against young girl planned to commit similar offenses with one of his character witnesses.

28.   *People v. Dunlap*, 138 A.D.2d 393 (2d Dep't 1988): Reversing conviction based on prosecutorial misconduct even though proof of defendants' guilt was overwhelming, where prosecutor in summation diverted jury's attention from witnesses' inconsistencies with elaborate depiction of defendants as sharks hunting prey. *See also People v. Williams*, 162 A.D.2d 488 (2d Dep't 1990) (reversing codefendant's conviction on same ground).

29.   *People v. Stewart*, 153 A.D.2d 706 (2d Dep't 1989): Vacating conviction where the "trial was marked by the prosecutor's efforts, even over sustained objections, to characterize the defendant as an individual predisposed to commit the crime charged."

30.   *People v. Langford*, 153 A.D.2d 908 (2d Dep't 1989): Ordering new trial where prosecutor suggested, with no evidence, that defendant's alibi witness used drugs and was involved in charged robbery, and made several improper remarks in summation, including denigrating defense counsel and defense witnesses, and suggesting to the jury that, in order to acquit, they would have to find that a witness had lied.

31.   *People v. Durham*, 154 A.D.2d 615 (2d Dep't 1989): Ordering new trial in part based on prosecutor's misconduct in summation, which included vouching for prosecution witnesses and referring pejoratively to defendant.

32.   *People v. Gomez*, 156 A.D.2d 462 (2d Dep't 1989): New trial ordered where prosecutor (1) defied court's order limiting cross-examination of witness on pending criminal case, prompting court to accuse prosecutor of bad faith, (2) cross-examined witness on his supposed communications with defendant, even though he knew the two were incarcerated and not free to converse, prompting court again to accuse

prosecutor of bad faith, and (3) in summation, attempted to inflame the jury, vouched for witnesses' credibility, denigrated the defense, and shifted the burden of proof.

33. *People v. Pinkas*, 156 A.D.2d 485 (2d Dep't 1989): Ordering new trial where court ordered counsel not to commingle discrete allegations, but prosecutor "repeatedly sought to join the two incidents during her summation in spite of the direction by the Trial Judge to desist."

34. *People v. Rivera*, 170 A.D.2d 544 (2d Dep't 1991): Reversing rape conviction because the prosecutor failed to disclose police reports that were "in direct conflict" with the complainant's rape allegation.

35. *People v. Gaskins*, 171 A.D.2d 272 (2d Dep't 1991): Reversing conviction where the prosecutor failed to disclose the videotape of an interview of the alleged child victim.

36. *People v. Stevens*, 174 A.D.2d 640 (2d Dep't 1991): Reversing conviction in part based on prosecutor's statement in summation that "if this defendant wasn't charged with sodomy . . . he should have been."

37. *People v. Delace*, 174 A.D.2d 688 (2d Dep't 1991): Reversing robbery conviction where the prosecutor failed to disclose witness statements.

38. *People v. Gunther*, 175 A.D.2d 262 (2d Dep't 1991): Reversing conviction where prosecutor improperly attempted to show defendant's propensity to commit the charged crime of dealing cocaine by extensively cross-examining him on past convictions for dealing marijuana.

39. *People v. Wilkens*, 177 A.D.2d 678 (2d Dep't 1991): Reversing convictions where, despite court order that defendant's use of aliases could be used only for identification purposes, prosecutor cross-examined defendant on the same topic for impeachment purposes and then argued on summation that defendant was not to be believed because he "hides behind three names."

40. *People v. Parker*, 178 A.D.2d 665 (2d Dep't 1991): Ordering new trial in part based on prosecutor's misconduct in summation, including improperly suggesting that defendant's daughter's unfazed demeanor on witness stand indicated that defendant had exposed her to drug dealing; trying to mislead the jury into finding defendant guilty by association; and announcing in open court that defendant's daughter was wearing T-shirt that court had refused to admit in evidence.

41. *People v. Baba-Ali*, 179 A.D.2d 725 (2d Dep't 1992): Reversing a rape conviction involving a four-year-old child where, despite a court order, the prosecutor failed until the eve of trial to disclose medical records finding no signs of sexual abuse.

42.  *People v. Mack*, 180 A.D.2d 824 (2d Dep't 1992): Reversing conviction where prosecutor failed to turn over notes that could have been used to impeach witness.

43.  *People v. Figueroa*, 181 A.D.2d 690 (2d Dep't 1992): Ordering new trial where prosecutor's summation "went well beyond the bounds of fair advocacy" by calling defendant's alibi witness untruthful, by suggesting that defendant was selling drugs on the night of his arrest for a crime he was alleged to have committed on another day, and by suggesting that defendant's alibi was concocted after the witness met with defense counsel.

44.  *People v. Clausell*, 182 A.D.2d 132 (2d Dep't 1992): Reversing a narcotics conviction where the prosecutor repeatedly denied the existence of a "buy report," which turned out to include a description of the buyer wholly at odds with the description the arresting officer had said he received and matched to the defendant.

45.  *People v. James*, 184 A.D.2d 582 (2d Dep't 1992): Reversing conviction where prosecutor represented that People would not introduce unfairly prejudicial evidence of defendant's prior possession of drugs but then cross-examined police officer extensively on that very evidence and emphasized it in summation.

46.  *People v. Andre*, 185 A.D.2d 276 (2d Dep't 1992): Reversing conviction where, among other things, prosecutor in summation improperly called People's key witness a "brave young girl" and asked jury not "to let her down."

47.  *People v. Campbell*, 186 A.D.2d 212, 587 N.Y.S.2d 751 (2d Dep't 1992): Reversing a robbery conviction because the prosecutor withheld hospital records which contained statements of the complainant contradicting her trial testimony.

48.  *People v. Nieves*, 186 A.D.2d 276 (2d Dep't 1992): Reversing conviction where prosecutor cross-examined accused on psychiatric history and then commented on the matter in summation even though there was no relevance whatsoever to the defendant's psychiatric history or condition.

49.  *People v. Odle*, 187 A.D.2d 536 (2d Dep't 1992): New trial ordered where prosecutor repeatedly elicited evidence of uncharged crimes against accused in order to show his criminal propensity and bad character, attempted to paint him as guilty by association, and committed summation misconduct.

50.  *People v. Banch*, 80 N.Y.2d 610 (1992): Reversing manslaughter conviction where the prosecutor "mistakenly" gave the defense the wrong police memo book, withheld prior affidavits of a People's witness, and falsely represented that a report by another People's witness contained no information required to be disclosed.

51.  *People v. Robinson*, 191 A.D.2d 595 (2d Dep't 1993): Ordering new trial where prosecutor "engaged in a series of improper remarks and tactics," including eliciting

testimony about defendant's post-arrest silence and stressing the point in both his opening and summation; eliciting improper expert testimony and mischaracterizing the issue in summation; and, also in summation, referring to defense counsel's summation as a "con job," vouching for the complainant's truthfulness, and "derisive[ly]" commenting on the presumption of innocence and defendant's right to remain silence.

52. *People v. Hill*, 193 A.D.2d 619 (2d Dep't 1993): Ordering new trial where prosecutor cross-examined defendant in a manner intended to improperly to show defendant's criminal propensity and then focused on this line of argument in summation.

53. *People v. Davis*, 196 A.D.2d 597 (2d Dep't 1993): Reversing a rape and robbery conviction where the prosecutor had refused to disclose the basis for the People's expert's conclusion that defendant's DNA matched that found on the victim.

54. *People v. Steadman/Blair*, 82 N.Y.2d 1 (1993): Reversing a defendant's manslaughter conviction where the District Attorney's Office made a "determined effort" to avoid its obligations to disclose exculpatory evidence and to correct false testimony, by employing a "scheme" under which a supervisor in the Office would make a cooperation agreement with a witness's attorney, but not reveal the agreement to the prosecutors handling the defendant's case at trial, and not correct the witness's false testimony denying such an agreement. *See also People v. Blair*, 186 A.D.2d 665 (2d Dep't 1992) (noting that the scheme operated at "the executive level of the District Attorney's Office").

55. *People v. Gaines*, 199 A.D.2d 335 (2d Dep't 1993): Reversing manslaughter conviction where the District Attorney's Office employed the same scheme condemned in *Steadman*, i.e., withholding a cooperation agreement made between the trial assistants' superior and the principal prosecution witness's attorney.

56. *People v. Torres*, 199 A.D.2d 442 (2d Dep't 1993): Ordering new trial based in part on prosecutor's persisting in lines of cross-examination over sustained objections, including questioning a defense witness excessively about his drug use, questioning defendant about irrelevant matter of whether he thought drugs were a problem in schools, and accusing defendant of tailoring his testimony after hearing other witnesses testify.

57. *People v. Fearnot*, 200 A.D.2d 583 (2d Dep't 1994): Reversing robbery conviction where the prosecutor withheld prior statements of the complainant describing the robbery, suggested, without evidentiary support, that the defendant was a prostitute, and tried to inflame the jury by citing the AIDS epidemic.

58. *People v. Kirchner*, 200 A.D.2d 766 (2d Dep't 1994): Reversing assault conviction

7

where the prosecution failed to disclose witness statements.

59. *People v. Baxley*, 84 N.Y.2d 208 (1994): Remitting a CPL 440 motion challenging a murder conviction for a hearing to determine the truth and materiality of a witness's affidavit, which stated that before trial he had informed the prosecutor that he and a People's witness had been induced by police to fabricate a jail-house confession, evidence the Court of Appeals deemed "crucial" to the People's case.

60. *People v. Elder*, 207 A.D.2d 498 (2d Dep't 1994): Reversing conviction in part based on prosecutor's unspecified improper comments in summation regarding two defense witnesses and a prosecution witness.

61. *People v. Giersz*, 212 A.D.2d 805 (2d Dep't 1995): Reversing conviction where prosecutor's summation "exceeded the broad bounds of rhetorical comment permissible in closing arguments."

62. *People v. Spinelli*, 214 A.D.2d 135 (2d Dep't 1995): Reversing conviction where prosecutor failed to cross-examine defendant on his post-arrest silence then attacked the defendant's credibility on that ground during summation, thus unfairly depriving defendant of chance to explain the silence.

63. *People v. Moss*, 215 A.D.2d 594 (2d Dep't 1995): Reversing conviction in part based on prosecutor's disregard of court's *Sandoval* ruling when cross-examining defendant, repeated references to defendant as a violent person, cross-examination questions calculated to compare defendant to Hannibal Lecter in *Silence of the Lambs*, remarks inviting jurors to put themselves in the shoes of victims being threatened by defendant, and waiving of a knife in front of the jury during summation.

64. *People v. Leuthner*, 216 A.D.2d 327 (2d Dep't 1995): Reversing conviction where prosecutor asked defendant whether the complainant was lying, asked defendant's character witness about her personal knowledge of the facts underlying defendant's past conviction, failed to establish a good-faith basis for questioning about a threat made by the defendant's father, and failed to stay within the four corners of the evidence during summation.

65. *People v. Scott*, 217 A.D.2d 564 (2d Dep't 1995): Ordering new trial based on "flagrant" and "pervasive" summation misconduct, where prosecutor (1) repeatedly referred to defendant as convicted felon, in an attempt to get the jury to convict defendant based on criminal propensity, (2) denigrated defendant, including by suggesting that defendant thought jurors just "fell off the stupid truck," and (3) attempted to shift the burden of proof.

66.   *People v. James*, 218 A.D.2d 709 (2d Dep't 1995): Ordering new trial on other grounds but noting "some unacceptable practices engaged in by the prosecutor" — namely, the "repeatedly condemned tactic" of suggesting during cross-examination and summation that the complainant, in identifying the defendant, was either correct or lying, and excessive references to the defendant's criminal record.

67.   *People v. Shim*, 218 A.D.2d 757 (2d Dep't 1995): New trial ordered where prosecutor failed to disclose police officer's notes.

68.   *People v. Ferrara*, 220 A.D.2d 612 (2d Dep't 1995): Affirming conviction but noting that prosecutor "committed several instances of misconduct during the course of his summation" by commenting, without proper foundation, on a defense witness's failure to provide the police with information; suggesting that defense counsel's objections had deprived jury of hearing certain testimony; and telling the jury that it should take only 10 to 15 minutes to decide the case.

69.   *People v. Torres*, 223 A.D.2d 741 (2d Dep't 1996): Reversing conviction where prosecutor made personal attacks on defense counsel and argued that there was no evidence that defendant was somewhere other than the scene of the robbery, which improperly shifted the burden of proof to the accused.

70.   *People v. Brown*, 224 A.D.2d 539 (2d Dep't 1996): New trial ordered where prosecutor failed to disclose firearms report that contained substantially different information than that given by People's witness at trial, which prejudiced defense by depriving it of the opportunity "to cross-examine the [witness] and test his credibility."

71.   *People v. Moustakis*, 226 A.D.2d 401 (2d Dep't 1996): Reversing conviction where the prosecutor presented a cooperating witness who "forgot" the details of his past crimes, but withheld 16 pages of interview notes detailing these crimes for the District Attorney's Office.

72.   *People v. May*, 228 A.D.2d 523 (2d Dep't 1996): Reversing a murder conviction where the prosecutor failed to disclose a cooperation agreement with its star witness and failed to correct his false testimony that no such agreement existed.

73.   *People v. Croons*, 231 A.D.2d 585 (2d Dep't 1996): Reversing robbery conviction where the prosecution wrongfully withheld prior statements of a key witness, the complainant.

74.   *People v. Bonnen*, 236 A.D.2d 479 (2d Dep't 1997): Reversing conviction based in part on prosecutor's failure to present evidence he had promised in opening that defendant had shot an additional victim, and then admitting at end of trial that he had "no information" as to that victim's whereabouts, prompting court to call

prosecutor's representation in his opening statement "disingenuous."

75. *People v. Ying*, 236 A.D.2d 630 (2d Dep't 1997): Reversing robbery conviction on other grounds, while condemning the prosecutor's withholding of the terms of a cooperation agreement with a People's witness.

76. *People v. Brown*, 241 A.D.2d 460, 663 N.Y.S.2d 975 (2d Dep't 1997): Ordering new trial where People agreed that prosecution's failure to disclose prior statements of arresting officer was prejudicial and mandated reversal.

77. *People v. Lippolis*, 246 A.D.2d 557 (2d Dep't 1998): Ordering new trial where prosecutor in his opening statement, among other things, improperly called the defendant a "parasite" and told the jury that "citizens like [them]selves indicted this defendant"; during direct examination of the arresting officer, elicited that defendant had remained silent after his arrest; and during summation, again referred to defendant's postarrest silence.

78. *People v. Mackey*, 249 A.D.2d 329 (2d Dep't 1998): Reversing robbery conviction where the prosecutor "deliberately" set a trap for the defense at trial by withholding critical information required to be disclosed earlier.

79. *People v. Walters*, 251 A.D.2d 433 (2d Dep't 1998): Ordering new trial where prosecutor repeatedly made inflammatory remarks designed to appeal to the jury's sympathy, such as commenting that the victim "was probably going to be a brilliant artist"; shifted the burden of proof by noting that the defendant did not call additional witnesses; stated that "the only real evidence is the People's evidence"; accused the defendant of tailoring his testimony after hearing the prosecution witnesses; described the defendant's testimony as "continued lies on top of lies, on top of lies," and "tales and lies, back and forth, back and forth"; gave his personal opinion on the truth and falsity of witnesses' testimony; vouched for the victim's credibility; and, "most egregious[ly]," insinuated that a gun recovered from defendant two weeks after the crime may have been used in the charged shooting, even though the prosecutor knew that a ballistics test had conclusively established otherwise.

80. *People v. Anderson*, 256 A.D.2d 413 (2d Dep't 1998): Ordering new trial where prosecutor (1) brought out only inculpatory portion of statement at trial and, thanks to trial court error, succeeding in blocking defendant's attempt to bring out exculpatory portion, and (2) compounded misconduct by telling jury in summation that accused had not made any exculpatory statement.

81. *People v. Brown*, 256 A.D.2d 414 (2d Dep't 1998): Reversing conviction on evidentiary grounds but noting as independent ground for reversal the prosecutor's improper comment on defendant's declining to testify, his misstatements of the

evidence, and his references to matters not in evidence.

82.  *People v. Rivera*, 259 A.D.2d 570, 684 N.Y.S.2d 896 (2d Dep't 1999): Affirming conviction but "deplor[ing] the continuous failure of the Assistant District Attorney to follow the admonitions of the trial court regarding his improper summation comments."

83.  *People v. Alfaro*, 260 A.D.2d 495 (2d Dep't 1999): Reversing conviction on evidentiary grounds and noting "clear impropriety" of prosecutor's remarks in summation that the presumption of innocence was "gone" or "vanquished"; that while the court would instruct the jury that the defendant had "a lot of rights," they should also consider the victim's rights; and that the jury should infer the defendant's guilt based on his having had a lawyer with him when he surrendered to police.

84.  *People v. Robinson*, 260 A.D.2d 508 (2d Dep't 1999): Ordering new trial based on prosecutor's summation misconduct where prosecutor improperly vouched for complainant's truthfulness, appealed to the jury's sympathies and fears by describing the elderly complainant as a person who would be a "classic victim anywhere in this city," accused the defense of manufacturing evidence and putting on perjurious witnesses who were "more full of crap than a Christmas turkey," said he was "ticked off" that members of defendant's family were in the courtroom when a defense witness testified, and ended by telling jury that "[t]he only way this defendant walks out of the courtroom is if you let him."

85.  *People v. Lewis*, 262 A.D.2d 584 (2d Dep't 1999): Ordering new trial in part based on prosecutor improperly asking a witness whether defense counsel offered him money or drugs in return for his testimony, and admonishing that such misconduct "is not to be repeated at any subsequent trial."

86.  *People v. Washington*, 278 A.D.2d 517 (2d Dep't 2000): Reversing conviction on other grounds but noting impropriety of prosecutor's arguments in summation that defendant's testimony was "a lie" and "a pile of crock," and was "fabricate[d]" after having had "the benefit of counsel," and that the defense's version of events was "patently absurd" and that the jury should not be "fooled" by it.

87.  *Farakesh v. Artuz*, No 99-CV-3945 (JG), 2000 WL 1480896 (E.D.N.Y. Oct. 3, 2000): Granting habeas petition because prosecutor impermissibly elicited extensive testimony from detectives about defendant's post-arrest silence, and repeatedly used this testimony in summation as evidence of defendant's guilty state of mind, and to impeach defendant.

88.  *People v. Smith*, 288 A.D.2d 496 (2d Dep't 2001): Ordering new trial where prosecutor "repeatedly stated unqualified pronouncements of the defendant's guilt,

often inappropriately injecting her personal views," such as the remark, "of course he did it. This isn't an issue of who did it"; vouched for witnesses' credibility; appealed to the sympathy of the jury by commenting that the victim was "courageous" for going to the police and for "coming before you" and that the victim was "ill" but still came to court; referred to evidence as "uncontroverted," which was a veiled (and improper) reference to defendant's declining to testify; and implied that a witness who could not speak and therefore did not testify would have fully corroborated the complaining witness.

89.    *People v. Leavy*, 290 A.D.2d 516 (2d Dep't 2002): Prosecutor improperly withheld *Brady* material such as promises of leniency given to cooperating witness, but court upheld conviction because defense had meaningful opportunity to cross-examine witness about it.

90.    *People v. Ni*, 293 A.D.2d 552 (2d Dep't 2002): Reversing assault conviction where the prosecutor's flagrantly improper comments during opening and closing statements shifted the burden of proof, inflamed the jury, and denigrated the defense.

91.    *Jenkins v. Artuz*, 294 F.3d 284 (2d Cir. 2002): Affirming grant of writ of habeas corpus where first prosecutor caused a mistrial by withholding a crucial witness's cooperation agreement until the day of his testimony, then second prosecutor, on retrial, allowed same witness to falsely deny the existence of the agreement, objected to the defense's efforts to bring it out, reinforced the witness's false denial on redirect, and bolstered the false testimony in summation.

92.    *People v. Lauderdale*, 295 A.D.2d 539 (2d Dep't 2002): Ordering new trial based in part on prosecutor's 31 references to defendant's highly prejudicial nickname, "Homicide."

93.    *People v. Bhupsingh*, 297 A.D.2d 386 (2d Dep't 2002): Reversing on other grounds, but noting that prosecutor's misconduct could have served as additional basis for reversal, where prosecutor persistently questioned defendant about collateral matters in a manner intended to denigrate him, continually asked leading questions of prosecution witnesses, placed inadmissible hearsay before the jury, improperly elicited evidence of prior consistent statements made by the complainant, and made inflammatory comments in summation that denigrated the defense and appealed to the sympathy of the jury.

94.    *People v. Ramashwar*, 299 A.D.2d 496 (2d Dep't 2002): Reversing conviction because prosecutor put her own credibility at issue by seeking to impeach two defense witnesses with their inconsistent prior statements to her, and by commenting upon the inconsistencies in summation.

95. *People v. Jones*, 305 A.D.2d 698 (2d Dep't 2003): Reversing robbery conviction where the prosecutor deliberately elicited police testimony in a manner that created the unfair impression that the codefendant had implicated the defendant to police, and where the trial court erroneously precluded the defense from cross-examining the complainant, who was the sole eyewitness, regarding the length of time it took him to identify the defendant at a lineup.

96. *People v. Jamal*, 307 A.D.2d 267 (2d Dep't 2003): Ordering new trial where prosecutor inappropriately told jury in summation that certain evidence was kept from them for "legal reasons"; argued that indictment was evidence of defendant's guilt; repeatedly gave his personal opinion as to the truth of prosecution witnesses' testimony and as to defendant's guilt; and shifted the burden of proof by referring to the People's evidence as "undisputed" and "[u]ncontroverted," while stating that defendant had "no explanation" and "no rational defense" and asking rhetorically, "[w]hat is the defense, ladies and gentlemen?"

97. *People v. Milligan*, 309 A.D.2d 950 (2d Dep't 2003): Ordering new trial in part based on prosecutor's improper vouching for witnesses' credibility.

98. *Su v. Filion*, 335 F.3d 119 (2d Cir. 2003): Granting habeas corpus relief in a murder case where the prosecutor failed to disclose a crucial witness's cooperation agreement, knowingly presented the witness's perjured testimony denying the existence of such an agreement and lying about his criminal conduct, and improperly bolstered the witness's false testimony on summation.

99. *People v. Thomas*, 8 A.D.3d 303 (2d Dep't 2004): Conviction set aside by trial judge after verdict based on *Brady* violations, but verdict re-instated by Appellate Division because issue was not preserved.

100. *Turner v. Schriver*, 327 F.Supp.2d 174 (E.D.N.Y. 2004): Granting federal habeas corpus relief in a robbery case where the prosecutor failed to investigate and disclose the criminal record of the People's only witness to the crime, elicited false testimony from the witness that he had no record, and gave false summation on the witness' absence of a criminal record to bolster the witness' credibility.

101. *People v. Mitchell*, 14 A.D.3d 579 (2d Dep't 2005): Reversing conviction where prosecution withheld police reports, causing substantial prejudice to the defendant.

102. *People v. Brown*, 30 A.D.3d 609 (2d Dep't 2006): Reversing conviction based on jury-instruction error, but citing as independent ground for reversal misconduct by the prosecutor during cross-examination and summation, including "presenting himself as an unsworn witness at trial, suggesting that the defense counsel did not believe his own client, making public safety arguments, and implying that certain key evidence had been kept from the jury due to legal technicalities."

13

103. *People v. Knight*, 18 Misc.3d 1129(A) (Sup. Ct. Queens Cty. 2007): Setting aside verdict after defense discovered that prosecutor failed to disclose significant *Brady* material concerning one of the homicide victims and related to defendant's legitimate self-defense claim.

104. *People v. Bennett*, 40 A.D.3d 653 (2d Dep't 2007): Ordering new trial where prosecutor ambushed defense by representing that he would not call witness and that no *Rosario* existed, but then turning over *Rosario* material and calling witness, and capitalizing on these unfair tactics in summation.

105. *People v. Frantz*, 57 A.D.3d 692 (2d Dep't 2008): Ordering 440 hearing in murder conviction where prosecutor failed to disclose prior inconsistent statements of cooperating witness, who was the only witness to testify that the defendant committed the crime, concerning such witness's alleged observations of the defendant.

106. *People v. Sayers*, 64 A.D.3d 728 (2d Dep't 2009): Ordering new trial in part based on prosecutor's improper comments in opening and summation regarding evidence of defendant's uncharged crimes.

107. *People v. Spann*, 82 A.D.3d 1013 (2d Dep't 2011): Reversing conviction where prosecutor improperly commented on the defendant's medical evidence, presented to explain his perspiration and rapid heartbeat during traffic stop, by referring to it as a "distraction," a "smokescreen," and "smoke and mirrors"; impermissibly shifted the burden of proof by telling jurors that if they did not find the defendant's testimony "reasonable," they could not "form the basis of reasonable doubt"; and stated 14 times that police had recovered a handgun from under the passenger seat of the car, where defendant was sitting, although no evidence was presented at trial to support that claim.

108. *People v. Anderson*, 83 A.D.3d 854 (2d Dep't 2011): Ordering new trial where prosecutor defied court's *Sandoval* ruling to ask "a series of irrelevant and prejudicial questions" concerning defendant's prior narcotics conviction, and in summation vouched for witnesses' credibility, denigrated the defense, and mischaracterized defendant's testimony.

109. *People v. Robinson*, 34 Misc.3d 1217(A) (Crim. Ct. Queens Cty. 2011): Ordering a hearing where prosecutor's delay in *Brady* disclosure was a "clear and unequivocal breach" of that prosecutor's responsibility.

110. *People v. Bedi*, Ind. No. 4107/96 (Sup. Ct. Queens Cty. March 13, 2013) (Griffin, A.J.S.C.): Setting aside murder conviction where prosecutor violated *Brady* by failing to disclose payments made to a key witness, and by failing to correct witness's false testimony that he did not receive such benefits.

14

111.  *People v. Joyner*, 126 A.D.3d 1002 (2d Dep't 2015): Reversing weapon possession conviction where prosecutor's summation deprived defendant of a fair trial by accusing him, without evidence, of uncharged crimes, and making statements implying guilt by association.

112.  *People v. Singh*, 128 A.D.3d 860 (2d Dep't 2015): Reversing rape conviction where prosecutor, during summation, acted as an unsworn witness, improperly invited the jury to speculate as to certain matters, denigrated the defense while vouching for the complainant's credibility, and shifted the burden of proof.

113.  *People v. Negron,* 26 N.Y.3d 262 (2015): Setting aside attempted murder conviction where prosecutor failed to disclose evidence pointing to a third party as the alleged shooter and then successfully precluded a third-party culpability defense by arguing lack of such evidence.

114.  *People v. Cantoni*, 140 A.D.3d 782 (2d Dep't 2016): Reversing conviction where prosecutor repeatedly shifted the burden of proof to the defendant, told the jurors that they would have to find the People's witnesses had lied in order to believe the defense, vouched for the credibility of police witnesses, and denigrated the defense.

115.  *People v. Redd*, 141 A.D.3d 546 (2d Dep't 2016): Reversing conviction for "pervasive prosecutorial misconduct" where prosecutor, in opening and summation, misstated the evidence, vouched for the credibility of witnesses, called for speculation by the jury, made inflammatory statements, and improperly denigrated the defense.

116.  *People v. Brisco*, 145 A.D.3d 1028 (2d Dep't 2016): Reversing conviction because prosecutor, in summation, attacked defense counsel's integrity, improperly referenced facts not in evidence, misstated critical witness testimony, and made inflammatory "safe streets" arguments.

117.  *People v. Davis*, 147 A.D.3d 1077 (2d Dep't 2017): Reversing conviction on other grounds but noting that prosecutor "made improper summation comments regarding the failure of the defendant to communicate certain information to the police at the time of his apprehension."