# LAW OFFICES OF JOEL B. RUDIN, P.C.

CARNEGIE HALL TOWER
152 WEST 57TH STREET
EIGHTH FLOOR
NEW YORK, NEW YORK 10019

TELEPHONE: (212) 752-7600
FACSIMILE: (212) 980-2968
E-MAIL: jbrudin@rudinlaw.com

JOEL B. RUDIN

DAVID E. RUDIN
PARTHA SHARMA

JACOB "COBY" LOUP
DAVID S. KEENAN
(OF COUNSEL)

AMARIAH THURSTON
(PARALEGAL)

September 4, 2025

**By ECF**
Honorable Taryn A. Merkl
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:  *Estate of Jaythan Kendrick v. New York City Housing Authority,*
No. 23-cv-358 (NGG) (TAM)

Dear Judge Merkl:

I write to oppose the applications of non-party Queens District Attorney's Office ("QCDA") and defendant New York City Housing Authority ("NYCHA") for a protective order to block deposition questioning of former Housing Authority Police Department ("HAPD") detective Richard DeFilippis regarding his conduct in the Allen Porter case.

In 1995, the Queens DA achieved the conviction of Jaythan Kendrick for a murder he did not commit. He spent more than 26 years in prison and then died due to a heroin habit he acquired in prison as a form of self-medication. The Queens DA's Conviction Integrity Unit ("CIU") found Mr. Kendrick was convicted based upon the false testimony of, among others, Mario Aguilo. New York City then settled the Estate of Jaythan Kendrick's lawsuit, which alleged improper police manufacturing of evidence and a *Monell* claim that prosecutorial misconduct in covering up *Brady* material regarding Aguilo was part of a long history of such misconduct by the QCDA, for $15 million. This settlement occurred pre-discovery—obviously, the evidence of the alleged misconduct was overwhelming. Now, the same DA's office that destroyed Mr. Kendrick's life seeks to interfere in civil discovery designed to assist him in his remaining claims involving NYCHA, for the apparent purpose of continuing to cover up the Office's misconduct in the Porter case.

The QCDA has no legitimate concern with preventing a deposition in a civil case of a retired police officer who was involved in a criminal case that was prosecuted 30 years ago and long ago finalized on appeal, where a state court has ordered a hearing to fully uncover all *Brady* violations that occurred. The hearing is into the QCDA's alleged coverup of coercive interrogation tactics by the same detectives who caused a key witness in Mr. Kendrick's case to

LAW OFFICES OF JOEL B. RUDIN, P.C.

Honorable Taryn A. Merkl
September 4, 2025
Page 2

suddenly adopt a new story that the Queens CIU has since admitted was false. On top of that, evidence has just emerged that the Office, for 30 years, despite numerous FOIL applications and related litigation by Mr. Porter, covered up documentary evidence pointing to the culpability of third parties for the underlying crime. The DA's Office cannot be permitted to lock down deposition testimony in a federal civil rights case where its transparent interest is to prevent any further evidence of police misconduct to be revealed and where it will be interfering in Plaintiff's effort to uncover potentially vital evidence supporting his wrongful conviction lawsuit.

**Factual Background**

1. Estate of Jaythan Kendrick's Federal Section 1983 Lawsuit

On November 30, 1994, the day of the homicide of Josephine Sanchez, the HAPD interviewed 18-year-old Mario Aguilo, who denied any knowledge of the crime other than seeing the body lying on the sidewalk. On December 4, 1994, after DeFilippis picked him up and brought him to be interviewed by DeFilippis and the assigned detective, John Reynolds, Aguilo, who was on probation, suddenly came up with a new story. The story appeared tailored in that Aguilo gave an extraordinarily detailed description of Kendrick's appearance, based upon a purported fleeting observation of him running with a purse, which just happened to exactly match Kendrick's clothing when detectives took him into custody approximately seven hours after the murder. As Reynolds acknowledged in his recent deposition, Aguilo's new story contradicted physical evidence and eyewitness accounts concerning the direction in which the perpetrator ran as well as the sole eyewitness's description of the clothing worn by the actual perpetrator. The same Queens DA's Office's CIU found Aguilo's second account false, noting that Aguilo's claim that he saw Kendrick while Aguilo was on his way from his girlfriend's apartment was directly contradicted by Aguilo's girlfriend, Jennifer Park, who said Aguilo was not there at all because she was in school. Richard DeFilippis, John Reynolds, and the other HAPD detectives on the Kendrick investigation were supervised by Lt. William McGuire.

After the Queens DA, Melinda Katz, appeared personally in state court to support the vacatur of Mr. Kendrick's conviction, his estate brought a lawsuit that, among other things, included a *Monell* claim alleging the original prosecutor covered up information impeaching witness Aguilo's credibility and that this *Brady* violation resulted from the deliberate indifference of then District Attorney Richard Brown to many dozens of similar *Brady* violations and related prosecutorial misconduct under his tenure. As noted above, the City settled out the claims against the DA's Office and individual detectives, including DeFilippis, last year, but Mr. Kendrick is continuing his claims against NYCHA. They include a *Monell* claim alleging policymakers' indifference to coercion of witnesses and fabrication of evidence and a malicious prosecution claim seeking *respondeat superior* liability for the misconduct of individual NYCHA detectives, including DeFilippis.

LAW OFFICES OF JOEL B. RUDIN, P.C.

Honorable Taryn A. Merkl
September 4, 2025
Page 3

    2.  HAPD Misconduct in *People v. Porter*

Allen Porter was convicted in 1996 of the December 30, 1991, murders of Charles Bland and Sherry Walker in the Woodside Housing Project in Queens. The most important witness against Porter was Vanessa Thomas, who claimed that Porter asked her to call him when she saw the decedent leaving his building; that shortly after she made that phone call, she heard gunshots; and that Porter later confessed to her that he committed the crime. The other star witness was Nathaniel Wright, the father of Thomas's two children. Wright testified that he and Porter plotted to kill the decedent and, on one occasion, followed the decedent to Brooklyn. The sole "eyewitness" in the case was a young woman named Jacqueline Aviles, a then 17-year-old mother of three who did not "identify" Porter until nearly four months after the crime.

On November 13, 2023, Porter filed a CPL 440.10 motion to vacate his conviction for *Brady* violations. Witness affidavits alleged that (1) DeFilippis participated in coercing Aviles to falsely implicate Porter, and (2) DeFilippis and his supervisor, Lieut. William McGuire—the same William McGuire who supervised him in the Kendrick investigation—coerced Thomas and Wright by threatening Thomas's prosecution for the murders if they did not cooperate. In opposition to the motion, DeFilippis submitted *two* detailed affidavits purporting to fully disclose his recollection of the salient events. *See* Ex. 1. On January 22, 2025, the court, persuaded by Porter's evidentiary showing, granted Porter's CPL § 440.10 motion to the extent of ordering an evidentiary hearing. On April 30, 2025, the Court granted Porter's motion for pre-hearing discovery of, among other things, literally *everything* in the District Attorney's file relating to the detectives' interaction with the witnesses Thomas and Wright. *See* Ex. 2. On August 14, 2025, the QCDAO disclosed notes apparently belonging to the trial prosecutor regarding the existence of an eyewitness who explicitly said Porter was not present at the scene and that Porter was innocent, which the QCDAO had suppressed for 33 years. *See* Ex. 3. According to his motion papers, Porter had been affirmatively seeking documents such as this since his heavily litigated FOIL application in 2013. Not until the evidentiary hearing ordered by the state court was imminent and the prosecutors were under a court order did the DA's lawyers—the same ones now seeking the protective order in this case—finally produce this document.[1] Following this disclosure, the court broadened the scope of the 440 hearing still further.

---

[1] ADA Piplani's unfounded attempt to block relevant discovery in Kendrick's case is consistent with her conduct, on behalf of the QCDA, in two other wrongful conviction cases in which she succeeded in blocking disclosure of *Brady* material until federal civil discovery forced such disclosures. My law firm represented Queens attempted murder defendant Shih Wei Su in a lawsuit under *Monell* for the deliberate indifference of the Queens DA to *Brady* violations and the knowing use of false testimony after the Second Circuit, in *Su v. Filion*, 335 F.3d 119 (2d Cir. 2003), granted habeas corpus relief for such due process violations at Mr. Su's trial in 1991. During her deposition, taken by the undersigned, Ms. Piplani, who opposed Su's post-conviction applications on behalf of the same Appeals Bureau she represents now, testified that, incredibly, she did essentially nothing when the original trial prosecutor, who was still in the Office, refused to cooperate with her in a look-back concerning the allegations in Su's state court motion. *See* Ex. 4 at 23:16–25:23. Ms. Piplani represented in an affirmation submitted in court that she had based

LAW OFFICES OF JOEL B. RUDIN, P.C.

Honorable Taryn A. Merkl
September 4, 2025
Page 4

### Argument

1. <u>Legal Standard</u>

Rule 26(c) affords protections for abusive or embarrassing discovery, providing that "[a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending ... The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.... " Fed. R. Civ. P. 26(c)(1). The burden is on the party seeking issuance of the order to show "good cause" through "particular and specific facts" as opposed to "conclusory assertions." *Rofail v. United States*, 227 F.R.D. 53, 54–55 (E.D.N.Y. 2005) (Azrack, M.J.).

Defendant and the QCDA seek a protective order for DeFilippis's deposition on the grounds that it would interfere with the ongoing *Porter* matter. *See* Dkt. 68 ("QCDA Mot.") and Dkt. 69 ("NYCHA Mot."). In determining whether to stay a parallel civil proceeding, courts often consider the following factors:

> 1) the extent to which the issues in the criminal case overlap with those presented in the civil case; 2) the status of the case, including whether the defendants have been indicted; 3) the private interests of the plaintiffs in proceeding expeditiously weighed against the

---

statements in the affirmation on her conversations with the trial prosecutor without revealing that prosecutor's refusal to cooperate with her own Office, *see id.* at 42:7–46:23, and then used procedural grounds to thwart Su's efforts to overturn his conviction until the Second Circuit finally granted relief years later. New York City eventually paid Su $3.5 million to settle his lawsuit alleging the DA's deliberate indifference to a sorry history of numerous *Brady* and other fair trial violations.

In the Kareem Bellamy civil case, also handled by my Office, *see Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019), the *Brady* violation cited in the Second Circuit opinion—evidence that a key witness was promised at trial, and ultimately received, thousands of dollars in undisclosed witness benefits and lied about it on the witness stand—was the subject of a *Brady* disclosure demand during a 440 hearing. Ms. Piplani represented to the state court that she had personally reviewed the Office's file and denied that the witness, Linda Sanchez, had received or been promised Section 8 or other benefits around the time of trial. She responded "[n]ot a thing" when asked by the court about "[a]nything indicating any promises that were made to her or offers that were made to her?" Ex. 5 at 3:19–5:19. This misled the state judge to deny a *Brady* claim (the court ultimately granted relief on a different ground). Ms. Piplani's representation proved false. Discovery in the federal 1983 case established that documentary evidence was in the file that Ms. Piplani reviewed showing that *during Bellamy's trial* the Queens DA's Office approved a $2,800 disbursement to cover rent, furniture, meals, and other expenses for Ms. Sanchez—an impoverished welfare recipient living in a single room—and provided her with tours of larger apartments it could move her to. *See* Ex. 6. Sanchez had testified at trial that her only benefit was her receipt of $100 in food payments and "overnight" housing. This truth would never have come out but for federal civil discovery and ultimately led New York City to pay Bellamy $8 million to settle his lawsuit.

LAW OFFICES OF JOEL B. RUDIN, P.C.

Honorable Taryn A. Merkl
September 4, 2025
Page 5

>prejudice to plaintiffs caused by the delay; 4) the private interests of
>and burden on the defendants; 5) the interests of the courts; and 6)
>the public interest.

*Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 99 (2d Cir. 2012) (quoting *Trs. of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995) (Chin, J.)).  A district court's decision requires "a particularized inquiry into the circumstances of, and the competing interests in, the case." *Id.*

"A stay of a civil case to permit conclusion of a related criminal prosecution has been characterized as 'an extraordinary remedy.'"  *Louis Vuitton*, 676 F.3d at 98 (quoting *Trs. of Plumbers & Pipefitters Nat'l Pension Fund*, 886 F. Supp. at 1139).  When the status of a criminal case is such that a defendant has been tried and convicted, that status "weighs strongly against the granting of a stay."  *See Bucalo v. Town of Southampton*, 2016 WL 11673815, at *2 (E.D.N.Y., Apr. 22, 2016) (Spatt, J.).

Most litigated cases have involved concern by *criminal defendants* with parallel litigation, particularly where they may be called upon to testify or produce potentially incriminating documents.  *See generally Louis Vuitton*, 676 F.3d at 97; *Hicks v. City of N.Y.*, 268 F.Supp.2d 238, 241 (E.D.N.Y. 2003) (Spatt, J.); *Doe v. Indyke*, 2020 WL 5518384, at *3 (S.D.N.Y. Sept. 14, 2020).  While the DA's Office cites a handful of cases where the movant was a prosecutor's office, those cases were brought out of concern for interference with a pending grand jury investigation or that a criminal defendant might use a civil suit to circumvent restrictions on criminal discovery prior to trial.  None involved a case such as this where the criminal trial occurred 30 years ago, the state court has ordered full disclosure of all the circumstances that would be covered by the civil deposition, and uncovering wrongfully suppressed evidence is the shared purpose of the collateral criminal proceeding and the civil deposition.

Absent a specific, compelling, non-speculative showing, a party's application for a protective order will be denied.  *See Gilead Scis. Inc. v. Khaim*, 753 F. Supp. 3d 262, 271 (E.D.N.Y. 2024) (Marutollo, M.J.), *aff'd*, 2024 WL 5318631 (E.D.N.Y. Dec. 17, 2024) (Merle, J.) (declining to "evaluate the merits of a stay solely on speculative and uncertain risks to defendant's interests where no showing of possible prejudice has been made") (cleaned up).

2. The *Louis Vuitton* Factors Weigh Overwhelming in Plaintiff's Favor and Against the Applications for a Protective Order

No applicant for a protective order in this case has made the kind of specific, non-speculative showing of prejudice that is required to justify a protective order.  DeFilippis, the witness, makes no application to protect any personal interest.  Neither NYCHA nor the QCDA asserts any Fifth Amendment or due process concern of a pending criminal defendant.  Indeed,

LAW OFFICES OF JOEL B. RUDIN, P.C.

Honorable Taryn A. Merkl
September 4, 2025
Page 6

the sole due process concern here is the concern of Allen Porter that he did not receive a fair trial and the effort by Estate of Kendrick, who concededly did not receive a fair trial, to obtain civil compensation from NYCHA to the extent it is liable. There is no pending grand jury proceeding that the deposition might interfere with, nor any restrictive criminal discovery statute that Plaintiff seeks to evade; thus, neither movant shows any compelling concern with prejudice. To the contrary, the Porter case involves an alleged coverup of *Brady* material by the Queens DA for 33 years, notwithstanding numerous discovery and FOIL requests, purportedly full disclosure already by the deponent in two affidavits filed in the state court proceeding, and a state court order that *requires* disclosure of all information that might conceivably be covered at the civil deposition. The apparent concern of the DA's Office is that DeFilippis, at his deposition, might, under Plaintiff's questioning, reveal further evidence of improper witness coercion or additional *Brady* violations. It is not with the disclosure of information that otherwise is protected from disclosure, since the state court has directed the DA's Office to disclose literally *everything* in its possession, custody or control concerning DeFilippis's role concerning Thomas and Wright.

Regarding the third factor—the plaintiff's interest in proceeding expeditiously weighed against the prejudice to the plaintiff caused by a delay—Plaintiff has an interest in the prompt resolution of a case in which it alleges NYCHA violated Mr. Kendrick's constitutional rights, causing his 26 years of wrongful imprisonment. Plaintiff has a significant interest in deposing DeFilippis regarding his conduct in the Porter investigation to allow time for any follow-up discovery or investigation before the present January 29, 2026, fact discovery deadline. *See Gilead Scis., Inc. v. Khaim*, 2024 WL 5318631, at *5 (E.D.N.Y. Dec. 17, 2024) (Merle, J.) ("This, of course, is the nature of discovery—it is a building block that affects the entirety of plaintiffs' case."). He shouldn't have to wait for when the Porter case is "on the calendar for December 8, 2025," QCDA Mot. at 2, with any actual hearing date totally up in the air. This is particularly so where there is no competing interest in protecting the parallel criminal proceedings.

The QCDA presumes to know, and minimizes, the relevance of DeFilippis's testimony to the civil case and offers that we can examine DeFilippis about the other cases he was involved in. *See* QCDA Mot. at 2 ("The Porter case has no relevance to plaintiff's present civil case."). But this Court has already observed that questioning about "interrogation techniques that were utilized by the officers [in the Allen Porter case] is relevant" to the Kendrick federal civil rights action. Ex. 7, Discovery Conference Tr. ("Tr.") at 16:9–11. The Court also already observed that DeFilippis's "credibility is at issue. His policing tactics over the course of his career are at issue." Tr. at 22:8–10.

The QCDA's position that we do not need to question DeFilippis about the Porter case when we can question him about his other cases is absurd. At his recent deposition, he claimed the *only* homicide case he recalls from his career as a detective is the Porter case. NYCHA has provided us no *Monell* discovery and we have no way of learning of other cases DeFilippis was

LAW OFFICES OF JOEL B. RUDIN, P.C.

Honorable Taryn A. Merkl
September 4, 2025
Page 7

involved in.  He does claim to remember the Porter case, and the parallels between the two cases make his deposition about that case essential.

The Court's preliminary ruling that the Porter case is relevant to the Kendrick federal civil rights action is clearly correct.  Misconduct by HAPD detectives in another homicide investigation one to two years prior to the Kendrick homicide investigation, including by a detective (DeFilippis) and lieutenant/supervisor (McGuire) involved in both cases, is relevant to Plaintiff's *Monell* claim, which alleges, among other things, an unlawful policy or practice of "[t]he use of excessive promises of rewards and unduly coercive or suggestive interrogation techniques with vulnerable potential witnesses, including drug users and addicts, drug dealers, and/or individuals fearing prosecution and imprisonment for their own criminal behavior." Am. Compl. ¶ 300(a), Dkt. 21.  The Porter case is also relevant to Plaintiff's malicious prosecution and *Monell* claims in showing, as to DeFilippis and McGuire, an absence of mistake or modus operandi under Fed. R. Evid. 404(b) and a lack of general credibility.  *See Gross v. Lunduski*, 304 F.R.D. 136, 145–46 (W.D.N.Y. 2014) (similar-act evidence admissible under FRE 404(b) for proper purpose of showing intent and also for credibility).

Indeed, our good faith basis for deposing DeFilippis regarding his role in both the Kendrick and Porter cases is supported by NYPD documents we have unearthed, not from NYCHA, which has produced virtually nothing, but through our subpoena of NYPD files.  In an NYPD employment evaluation, which the same Lt. McGuire reviewed and signed off on, DeFilippis was commended for being "especially skilled in taking the seeds of previously investigated cases and bringing them to fruition with arrests," "obtaining admissions from suspects," and "investigating Homicides that have been investigated previously."  Ex. 8.  DeFilippis testified at his recent deposition that his interrogation tactics were no different at the HAPD.

Based on Aguilo's radical change of story that included details contradicting the only eyewitness, Brandon Rogers, and matching Jaythan Kendrick's outfit at his arrest, it appears likely that the detectives pressured Aguilo to change his story and fed him the facts relating to Kendrick.  At his deposition, Reynolds denied doing so during the actual interview, but testified that DeFilippis alone picked up Aguilo and brought him to the interview.  It is likely DeFilippis fed the information to Aguilo before they met with Reynolds, fitting with DeFilippis's reputation as a "closer."  Evidence that DeFilippis did this in the Porter case would potentially be admissible under Rule 404(b) to show intent and absence of mistake in the Kendrick case.  It would also show a practice and deliberate indifference relevant under *Monell*, as HAPD's apparent practice of bringing DeFilippis into difficult cases as a "closer" suggests his superiors were aware of, and sanctioned, the tactics he employed to manufacture new, incriminating evidence in such cases.

As for NYCHA, it has no standing to assert interests from a criminal proceeding it is uninvolved in.  In addition to reasserting the same frivolous relevance arguments that the DA's

LAW OFFICES OF JOEL B. RUDIN, P.C.

Honorable Taryn A. Merkl
September 4, 2025
Page 8

Office makes, NYCHA argues that it is entitled to a protective order based on annoyance and undue burden to NYCHA under FRCP 26(c). But there would have been no undue burden on NYCHA's counsel for DeFilippis to have answered the Allen Porter questions at his deposition. The only undue burden here is that, assuming a favorable ruling by this Court, Plaintiff will now incur additional fees and costs in taking DeFilippis' deposition a second day. *See, e.g.*, Tr. at 15:19–16:11 ("To be clear, to be perfectly clear, Rule 30(c)(2) is quite specific that … [t]he deposition must continue and the deponent must answer questions unless the behavior during the deposition reaches the point where you need to suspend the deposition because of possible conduct…So I just don't know what you're seeking of me at this juncture.").

The only conceivable reason for the QCDA's present application is it wants to prevent any further disclosure of improprieties including *Brady* violations in the Porter case. There is no equitable or public interest in facilitating a continuing coverup. Rule 3.8(g) and (h) of the New York Rules of Professional Conduct make clear that when a prosecutor becomes aware of new, credible, and material evidence creating a reasonable likelihood that a convicted defendant did not commit the offense, the prosecutor has an affirmative duty to disclose that evidence to the defense and, if the conviction was obtained in the prosecutor's jurisdiction, to undertake further investigation and take remedial action as appropriate. The QCDA's application would turn that ethical rule on its head. The possibility that the deposition of DeFilippis might yield exculpatory evidence is not a basis to limit his deposition. A prosecutor cannot invoke the pendency of a post-conviction proceeding as a reason to block the development of evidence that could bear on innocence.

Finally, the court has an interest in the expeditious resolution of cases on its docket. *See* Fed. R. Civ. P. 1; *see also Hicks*, 268 F. Supp. at 243 (E.D.N.Y. 2003) ("Courts have an interest in managing its cases and efficiently resolving litigation. If the Court granted the present motion, it would needlessly delay resolution of this case.") (cleaned up). The public has an interest in the resolution of cases of public significance, particularly a *Monell* case exposing systemic misconduct by a municipal police department and NYCHA's defense of misconduct that cost an innocent man 26 years of his life in prison. *See Louis Vuitton*, 676 F.3d at 103 ("public's interest in prompt further protection of the plaintiff and the public through the civil action").

### Conclusion

The City deemed the QCDA's misconduct in this case so egregious it merited a $15 million settlement. Now the same DA's office is seeking to block discovery in this case without articulating any basis. NYCHA has no standing beyond insisting on a relevance objection it has been told repeatedly is indefensible. For the foregoing reasons, the Court should deny the QCDA and NYCHA's motions and order any other relief it deems proper, including, in light of the patently frivolous nature of the protective order applications, awarding Plaintiff fees and costs under F. R. Civ. P. 11 and 30(d)(2), for the work opposing the applications and having to now take another deposition of DeFilippis. *See McKenzie-Morris v. V.P. Recs. Retail Outlet, Inc.*,

LAW OFFICES OF JOEL B. RUDIN, P.C.

Honorable Taryn A. Merkl
September 4, 2025
Page 9

638 F. Supp. 3d 333, 338 (S.D.N.Y. 2022) (Rule 11 sanctions appropriate where it is "patently clear" that a motion has "absolutely no chance of success under…existing precedents"); *Cordero v. City of New York*, 2017 WL 2116699, at *5 (E.D.N.Y. May 12, 2017) (Pollak, M.J.) (Rule 30 sanctions appropriate where "fair examination of the deponent was frustrated, impeded, or delayed").

                        Respectfully submitted,

                        /s/

                        Joel B. Rudin

cc:    Edward A. Flores (via ECF)
       Larisa Girsh (via ECF)
       *Counsel for Defendant NYCHA*

       Brian Francolla (via ECF)
       *Counsel for City of New York*

       Ranjana Piplani (via email)
       Assistant District Attorney
       Queens District Attorney's Office
       125-01 Queens Blvd
       Kew Gardens, New York 11415
       rcpiplani@queensda.org

       Nancy Talcott (via email)
       Assistant District Attorney
       Queens District Attorney's Office
       125-01 Queens Blvd
       Kew Gardens, New York 11415
       nftalcott@queensda.org