# LAW OFFICES OF JOEL B. RUDIN, P.C.

CARNEGIE HALL TOWER

152 WEST 57TH STREET

EIGHTH FLOOR

NEW YORK, NEW YORK 10019

TELEPHONE: (212) 752-7600

FACSIMILE: (212) 980-2968

E-MAIL: jbrudin@rudinlaw.com

JOEL B. RUDIN

DAVID E. RUDIN
SAM THYPIN-BERMEO
SAM KUHN
PARTHA SHARMA

JACOB "COBY" LOUP
DAVID S. KEENAN
(OF COUNSEL)
AMARIAH THURSTON
(PARALEGAL)

April 13, 2026

**By ECF**
Honorable Taryn A. Merkl
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re: *Estate of Jaythan Kendrick v. New York City Housing Authority,*
> No. 23-cv-358 (NGG) (TAM)

Dear Judge Merkl:

Our firm represents Plaintiff Estate of Jaythan Kendrick in this § 1983 action. I write concerning three discovery disputes with Defendant New York City Housing Authority ("NYCHA") that we were unable to resolve through meet-and-confers. Pursuant to your Honor's Individual Rule 3.A, we request an informal conference with the Court about these issues.

1. **Plaintiff seeks to take a *de bene esse* deposition of Daphne Ingram, an 89-year-old fact witness we recently learned is in poor health**

On March 27, we learned that one of Plaintiff's witnesses, Daphne Ingram, is suffering from significant health issues that create a substantial risk she will be unavailable to testify at trial. Ms. Ingram, 89, informed us that she has a heart condition called mitral stenosis, which has worsened in the past few months, causing her difficulty breathing, as well as diabetes, high blood pressure, and kidney disease. We immediately asked NYCHA to agree to a deposition to preserve her testimony, but NYCHA objected on the basis of relevancy. However, as we explained to NYCHA's counsel, Joel Ray, Ms. Ingram will testify that the murder victim by stabbing, Josephine Sanchez, lived alone, rarely had visitors, and did not have a male partner. This testimony, combined with our DNA expert's testimony that it is rare for any foreign DNA to be found under an individual's fingernails, and that male DNA that was *not* Kendrick's was found under Ms. Sanchez's fingernails, would support the inference that another man killed Ms. Sanchez. While innocence is not an element of the Kendrick Estate's claims against NYCHA, Kendrick's innocence supports the inference that it was improper police suggestion or coercion, and not the independent decisions of two youthful witnesses, which led them to change their initial accounts and accuse him. *See, e.g., Ortiz v. Stambach*, 137 F.4th 48, 63–66 (2d Cir. 2025) (plaintiff's innocence supported inference that detective's misconduct brought about plaintiff's confession).

Evidence of innocence also may relate to damages. *See Peacock v. City of Rochester*, 2016 WL 4150445, at \*3 (W.D.N.Y. Aug. 5, 2016) (in assessing damages, noting that wrongfully convicted plaintiff's "anguish was aggravated by his knowledge of his innocence"). Ms. Ingram's deposition would be brief and by videoconference, given her health.

*Defendant's Position*

Fact discovery in this matter closed as of January 30, 2026. Prior to the close of fact discovery, the parties negotiated and the Court approved several extensions due to the desire of Plaintiff to complete certain, specified discovery. Never mentioned among the specified discovery sought or, for that matter, witnesses disclosed, was the deposition of Ms. Ingram. Presumably, Plaintiff had knowledge of Ms. Ingram's existence during the course of fact discovery, and Plaintiff identifies no reason why her deposition was not sought or obtained during the course of fact discovery. When Mr. Ray discussed the issue with Mr. Partha Sharma, Esq., and Mr. David Rudin, Esq., Plaintiff's attorneys, neither stated that she was suffering a sudden failing of her health such as being admitted to a hospice or that she has a limited time left. There is no indication that Ms. Ingram's health condition played any role in Plaintiff not seeking her deposition during fact discovery. Now, fact discovery is closed. Plaintiff's counsel's decision not to take Ms. Ingram's deposition was already made; her health condition (which Plaintiff's counsel does not indicate was sudden) may have justified taking her deposition earlier than usually permitted, but does not justify taking it later than usually permitted.

Plaintiff must show good cause for the post close of fact discovery testimony. "[A]s courts in this district have held, both discovery and *de bene esse* deposition 'are governed by the scheduling order' set by the Court, and may not be conducted after the close of discovery absent good cause to modify that order [internal citations omitted]." *George v. Ford Motor Co*, 2007 WL 2398806 at 12 (S.D.N.Y. 2007). Plaintiff's counsel has not shown good cause why Ms. Ingram's potential testimony is materially relevant and necessary. While Plaintiff's counsel notes Ms. Ingram has various health issues, it is unclear how long she has been suffering these issues. This matter has been proceeding for three years, which was more than sufficient time for Plaintiff's attorneys to seek Ms. Ingram's deposition prior to the close of discovery. Simply put, Plaintiff offers nothing to explain what about Ms. Ingram's health changed over the course of these three years to require her deposition now after discovery closed.

Additionally, a *de bene esse* deposition is a deposition taken in anticipation of a future need. Here there is no future need because Ms. Ingram's potential testimony is materially irrelevant to the claims in this matter and offers no facts or other information to support Plaintiff's claims or damages that is not already being offered by others. When Plaintiff's counsel, Jonathan Hiles, Esq., made the request to Defendant in his e-mail dated March 27, 2026, he stated that the purpose of taking Mr. Ingram's deposition was to preserve her testimony contained in Ms. Ingram's one page affidavit dated July 23, 2017. Ms. Ingram's affidavit does not indicate her firsthand knowledge of the investigation. The affidavit merely set forth a) she lived in the building down the

hall from Ms. Sanchez, the tragic elderly victim who was brutally murdered; b) that Ms. Sanchez lived by herself and rarely saw visitors; and c) that Ms. Ingram did not remember the type of pocketbooks the elderly murdered victim owned. The affidavit offers no evidence, facts or firsthand knowledge regarding the investigation conducted by HAPD officers or whether they had probable cause to arrest Mr. Kendrick. Even indirectly, her potential testimony offers no materially relevant facts as to whether Ms. Sanchez was visited by any men on the day of the murder Therefore, Ms. Ingram's potential testimony offers nothing independent as to what is already known through the DNA evidence.

Plaintiff's counsel argues that it is being offered to support damages, however, the two cases cited in support are distinguishable in this matter. Plaintiff cites to sections of *Ortiz*, *supra*. that relate to whether it was proper for certain evidence to be in front of the jury that is unrelated to Ms. Ingram's potential testimony as limited by her affidavit. The relevant section cited to in *Ortiz*, *supra* at pg 67, related to a police officer who was found to have coerced a wrongfully convicted person. Here, Ms. Ingram was not present for any police interviews of Mr. Kendrick, nor does she have any evidence regarding alleged coercion of Mr. Kendrick (based on the affidavit that was exchanged). *Peacock, supra*, is also distinguishable because the wrongfully convicted person was suffering serious mental illness before he was arrested. As can be seen, Ms. Ingram will not be offering any evidence of Mr. Kendrick's mental state before or after his incarceration. Again, her potential testimony offers nothing relevant in this matter that Plaintiff does not already have.

Ms. Ingram's potential testimony offers nothing materially relevant to the issues in this matter and therefore Plaintiff failed to offer good cause for seeking this deposition after fact discovery closed and the request should be denied.

2. **Plaintiff seeks to serve a subpoena *duces tecum* upon the NYPD for records supporting its *Monell* claim**

On January 29, 2026, the parties jointly wrote to the Court seeking leave to conduct two depositions after the January 30 discovery deadline. Doc. 82 at 1. Plaintiff sought to depose Jacqueline Levy, the records access officer for the New York City Civilian Complaint Review Board ("CCRB"), regarding complaint data involving officers employed by the Housing Authority Police Department ("HAPD"), after the CCRB had declined to provide a certification authenticating this data, whereas NYCHA sought to depose one of the co-executors of the Kendrick Estate. *Id.* The Court granted the parties' request by minute order on January 30.

Plaintiff served a deposition subpoena on Ms. Levy on February 3. In lieu of testifying, Ms. Levy provided a declaration, dated February 12, concerning the data at issue. Ex. 1. Her declaration explains that, in the CCRB's complaint and allegation database, complaint numbers beginning with the prefix "62" correspond to the HAPD, which she could tell based upon records

in the CCRB's archives concerning an officer named Joseph Sessa. *See id.* at ¶¶ 10–16. This prefix differentiates these entries from those involving the NYPD.

Ms. Levy's declaration similarly explains that complaint numbers beginning with the prefix "63" correspond to the Transit Police Department ("TPD"), based upon records pertaining to a police officer named Thomas Harrigan. *Id.* at ¶¶ 17–21. While data pertaining to the TPD is not directly relevant to Plaintiff's claims, the fact that a similar numbering convention was used for data pertaining to the TPD, which merged with the NYPD at the same time as the HAPD, corroborates the inference that "62" complaints correspond to the HAPD.

Upon receiving this declaration, Plaintiff sought to corroborate Ms. Levy's inferences by obtaining documentation definitively proving that Officers Sessa and Harrigan were, respectively, HAPD and TPD officers who transferred to the NYPD. On February 13, a day after receiving the executed Levy Declaration, our office contacted Joseph Varvara, Esq., of the NYPD's Legal Bureau. On February 20, Mr. Varvara, based upon the NYPD's records, confirmed by email that Officer Sessa transferred from the HAPD to the NYPD on December 3, 1992, and that Officer Harrigan transferred from the TPD to the NYPD on April 2, 1995. However, after much back and forth, Mr. Varvara informed us on March 6 that he could not provide us these records, as well as a certification of authenticity, without a subpoena. That same day, we asked NYCHA's counsel to stipulate to the underlying facts, but nearly two weeks later, Mr. Ray declined to stipulate and opposed our request for a subpoena. Hoping to avoid this dispute, we obtained a March 30 appointment to visit the New York City Municipal Archives and Library to view certain documentary materials, but they did not contain the information.

Post-deadline discovery may be permitted upon a showing of "good cause" under Fed. R. Civ. P. 16(b)(4), with "'good cause' being liberally construed," such that the standard may be met by demonstrating that a party "could not reasonably meet its deadline despite diligent efforts." *Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co.*, 233 F.R.D. 338, 342 (S.D.N.Y. 2005) (citation omitted). Here, Plaintiff had no reason to seek documents concerning Officers Sessa and Harrigan prior to the discovery deadline; Plaintiff only had reason to do so upon receiving the Levy Declaration naming these officers. Plaintiff has since diligently sought the requisite documentation and seeks judicial relief now after exhausting other avenues. NYCHA shows no unfair prejudice to it, but opposes on relevancy grounds. However, the records are necessary to support Plaintiff's *Monell* theory that the HAPD was deliberately indifferent to the need to monitor and, as appropriate, discipline officers, including Officer Sessa, who were repeatedly alleged to have committed misconduct but were rarely if at all disciplined for it.

*Defendant's Position*

The CCRB complaint report regards complaints made against all police officers, since the early 1990s for behavior as minimal as using disrespectful language or "abuse of authority" (the report does not define or detail what behavior constitutes "abuse of authority," it is an undefined

term).There are over 390,000 complaints in the report of which, it appears, Plaintiff needs to week out the complaints against HAPD officers to support Plaintiff's *Monell* claim. It is unclear from Plaintiff's request that they will seek further discovery once they establish which of the thousands of complaints are against HAPD officers and then which ones are related to the *Monell* claim. Allowing discovery as to the CCRB complaint report to continue at this time, after fact discovery closed, is clearly unduly burdensome, as *Monell* discovery is. Therefore, any further *Monell* discovery should be denied because fact discovery has closed or, at the very least, the *Monell* discovery should be stayed until Plaintiff has shown that it has a viable *Monell* claim, i.e. after the time of the parties' summary judgment motions[1]. Generally, courts often stay discovery of *Monell* claims until there is enough information to assess the strength of plaintiffs' *Monell* claims that a constitutional violation occurred. *Oliver v City of New York*, et al, 540 F.Supp.3d 434, 436 (S.D.N.Y 2021).

Plaintiff's subpoena seeking information to establish which complaints are attributable to HAPD is prejudicial to NYCHA because it seeks information that will continue *Monell* discovery. The request should be denied or at a minimum, stayed until after the parties have brought summary judgment motions as to the *Monell* claim. This is further discussed in Defendant's Section 4 below.

3. **Plaintiff seeks to compel NYCHA to produce a sufficient affidavit establishing its inability to locate relevant documents presumptively in its possession and, as to documents it is withholding, a privilege log**

On November 26, 2025, Plaintiff served on NYCHA a demand for information and documents concerning civil lawsuits involving HAPD officers. Ex. 2. Payment of substantial monetary settlements in other cases involving misconduct similar to this case provided notice and, coupled with a lack of discipline, may establish deliberate indifference under *Monell*. On December 22, 2025, following negotiations between the parties, NYCHA agreed to conduct a search for a subset of the lawsuits encompassed by the demand and to provide an affidavit explaining any inability to locate or produce such records. After repeated delays, NYCHA finally produced such an affidavit on March 19, Ex. 3, but it is deficient.

*First*, the affidavit baldly asserts that responsive files "were previously disposed pursuant to NYCHA's retention policy between 2000-2020 with most being disposed between 2007 and 2008," but it does not explain the affiant's basis for that contention. Ex. 3 at ¶ 10. The affidavit describes a search process under which NYCHA queried internal and vendor-maintained computer programs with plaintiff names and, in some instances, internal index numbers. *Id.* at ¶¶ 3, 5–7. But it does not explain *how* querying those programs shows that the associated files were destroyed. *Second*, the affidavit details a search methodology for "litigation files," and lists three files that were located, but it does not address any search for settlement data, for instance, in the records of

---

[1] With regards to Defendant's prior requests to move to dismiss, the court has shown a disinclination to allow that motion to go forward and instead has directed that any dismissal of Plaintiff's *Monell* claim should wait until summary judgment motions are made.

NYCHA's finance department or other units that processed the payouts to plaintiffs.[2] *Third*, the affidavit states that "*[c]losed* litigation files from the period before the year 2000, such as the ones demanded by Plaintiff, are stored in boxes," *id.* at ¶ 3 (emphasis added), but it does not make clear how cases initiated before 2000, but resolved in or after 2000, are stored. *And fourth*, the affidavit indicates that NYCHA failed to locate certain files even though they were *not* destroyed pursuant to NYCHA's retention policy, *id.* at ¶ 9, but does not detail what steps were undertaken to retrieve them. Plaintiff requests that NYCHA be ordered to produce an affidavit that remedies these deficiencies.

Finally, on March 26, NYCHA informed Plaintiff that it had withheld "internal documents" that contained information responsive to Plaintiff's demands, specifically settlement amounts requested in Interrogatories 8 and 9, but did not identify or claim any privilege entitling it to withhold these documents, nor did it provide a privilege log. At our March 31 meet-and-confer, Mr. Ray represented that he would review the underlying records to determine why the records were withheld and to provide a privilege log if warranted, but he refused to agree to a deadline. NYCHA should be ordered to produce the records or a privilege log forthwith.

*Defendant's Position*

Plaintiff's Second Set of Interrogatories and Document Requests which was served the day before the Thanksgiving Holiday, sought the production of over 120 old and closed litigation files from approximately thirty to forty years ago. Plaintiff limited that demand to certain information contained in those files: a) the name of the HAPD officer involved; b) their command; c) the substance of the allegations against the officer; and d) the result of the lawsuit including the settlement amount or the jury award. The demand also requested a) the documents related to such information; b) records evidence that NYCHA Law's Department or lawyers to HAPD referred the officers for investigation or discipline; and c) records regarding investigation or discipline of the officers.

Despite only finding three cases, Plaintiff's counsel insisted that an affidavit be provide outlining NYCHA's efforts to locate the records. Such an affidavit, a so called "Jackson Affidavit," should include: (1) an explanation of where and how documents of the type sought are maintained; (2) who maintains them; (3) what efforts were made to locate them; and (4) the results of the search. The exact language may, of course, vary. As the *Jackson* court stated, an affidavit should state the good faith search efforts made and should include "where the subject records were likely to be kept, what efforts, if any, were made to preserve them, whether such records were routinely destroyed, or whether a search had been conducted in every location where the records were likely to be found." *Jackson v. City of New York*, 185 A.D.2d 768 (1st Dept 1992).

---

[2] Plaintiff never told Defendant that NYCHA's legal or finance departments are *statutorily required* to maintain date on expenditures, including civil settlements or layouts, only that Plaintiff has reason to believe that such financial recordkeeping exists.

Here, Mr. Wong and his staff at NYCHA's Public Information department were given the gargantuan task to locate these over 120 old and closed legal matters over the holidays and they still had to respond to equally important requests for documents such as subpoenas in other equally important legal matters. Mr. Wong's affidavit more than meets the requirements of a "Jackson Affidavit." It sets forth the documents that were requested (30-40 year old and closed litigation files), the likely location where the records were kept (in boxes located in either NYCHA's or NYCHA's vendor's warehouse), whether the records were routinely destroyed (almost all records were disposed i.e. shredded, prior to commencement of this litigation per NYCHA's document retention policy), that the search was conducted in every location they were likely to be found (boxes stored in the warehouses), and the result of the search (almost all files were disposed, they were unable to locate about six files and they only found three files). There is nothing further to detail. A "Jackson Affidavit" does not require a search in every possible location, but *in those locations where records are likely to be found* and here, Mr. Wong and his incredible staff searched in the locations where those old and closed litigation files were likely kept and provided the results of that search. Therefore, NYCHA met the requirements for Mr. Wong's affidavit and no further information is necessary.

Plaintiff's counsel now argues that <u>Plaintiff's Second Set of Interrogatories and Document Requests</u> seeks settlement data in records such as NYCHA's finance department. That was not part of nor included in that demand. The demand was limited to a search for approximately 120 old and closed litigation files and *the information contained in those files*. During the parties' telephone conference on December 19, 2025, Mr. Sharma, first made a request for settlement information outside the demand to include a so called "settlement ledger." Mr. Ray objected to the production of such on the grounds that settlement information was not allowed. Mr. Sharma provided two cases in support of his position that Mr. Ray, upon review, demonstrated were clearly not controlling in this matter and distinguishable on the law and facts. Those two cases were only in the context of actually physical injury and the court permitted admission into evidence at trial of the prior settlement amounts for the limited purpose that the settlements reflected the severity of the actual physical injury.

In a further telephone discussion on December 22, 2025, Mr. Sharma again requested the settlement information arguing that NYCHA was required to keep a settlement ledger like the City of New York and again Mr. Ray objected. Mr. Ray insisted that Mr. Sharma provide a code, statute or local law that requires NYCHA to keep a "settlement ledger" like the City. Mr. Sharma responded in his e-mail dated December 23, 2025, revising his position that it was only his "*belief*" that such a ledger was required. He did not provide any such statute requiring NYCHA to keep such information. Not only does Plaintiff's counsel demand documents and things beyond what Plaintiff's demanded, but also seeks documents and things that do not exist nor were required to be kept, which is an indicator that such a demand is nothing more than a "fishing expedition."

NYCHA did in fact exchange information regarding the resolution of the three litigation files that were found except for privilege. All three matters that were found had settled. Settlement

information was exchanged which included providing the Releases for one of the matters. As for the other two matters, the settlement information was found in NYCHA's internal documents that are privileged documents. Defendant does not believe Plaintiff is entitled to those documents. However, to the extent that the court determines otherwise, we will provide a privilege log at that time.

### 4. Defendant's Request to Deny or Stay Any Further Monell Discovery

In light of the additional *Monell* discovery sought by Plaintiff and the potential of further discovery regarding the *Monell* claim, the court should deny any further requests by Plaintiff for *Monell* discovery because fact discovery has closed, or the court should stay such discovery until after the parties have made their summary judgment motions. *Oliver v City of New York*, 540 F.Supp.3d 434 (S.D.N.Y. 2021). Defendant seeks a stay of the *Monell* discovery because Plaintiff has not demonstrated whether the *Monell* claim is viable, i.e. whether the HAPD Police officers actually committed a constitutional tort against Mr. Kendrick. "In a lawsuit containing a *Monell* claim, if the plaintiff cannot show that his or her constitutional rights were violated by any individual defendants, the *Monell* claim will also fail." *Oliver v City of New York*, 540 F.Supp.3d at 436. Because discovery related to a *Monell* claim is obviously burdensome by its very nature, courts generally stay *Monell* related discovery until it has been shown that such claim is viable. *Oliver v City of New York, Oliver v City of New York*, 540 F.Supp.3d 434 (S.D.N.Y. 2021) (staying *Monell* discovery against NYPD until after it was shown that a constitutional tort was committed).

While Plaintiff asserts a *Monell* claim, Defendant has yet to test whether that claim is viable. As the court knows, Plaintiff moved to amended the complaint in response to Defendant's request to bring a motion to dismiss as to the *Monell* claim. Since service of the amended complaint, there has been no test, i.e. motion to dismiss, as to the viability of the *Monell* claim. In fact, the court has put that off until the time of the parties' summary judgment motions. Therefore, all remaining *Monell* discovery, such as herein in dispute, should be stayed until it has been shown that the *Monell* claim is viable.

*Plaintiff's Position*

The parties met and conferred on the first three discovery issues detailed above on March 31, as required by this Court's individual rules. Plaintiff only learned of NYCHA's application to "stay *Monell* related discovery" on April 9 when it received NYCHA's insertions to this joint discovery letter and noticed NYCHA had inserted a fourth issue. The Court should reject NYCHA's nonsensical request. NYCHA repeatedly asked for extensions to respond to Plaintiff's second discovery request during the fact discovery period and even after the close of fact discovery. In each extension request, NYCHA represented to Plaintiff and the Court that it would produce an affidavit detailing its search for records and that it would not oppose as "untimely" Plaintiff's right "to move to compel further disclosures if NYCHA's production or affidavit are incomplete." Dkt. 82 at 1–2; *see also* Dkt. 85 (promising "to provide an appropriate affidavit concerning records that

## Law Offices of Joel B. Rudin, P.C.

could not be found"). If NYCHA's Public Information department has already conducted an adequate search, it should be able fill the informational gaps Plaintiff has identified in its deficient affidavit with minimal additional effort. NYCHA's adamant opposition—and its counsel's refusal to answer Plaintiff's questions about NYCHA's search— suggests that NYCHA has not conducted the search it agreed to undertake. Similarly, its refusal to provide a privilege log—a fundamental obligation under Rule 26(b)(5)—for documents it does not dispute are responsive to Plaintiff's discovery requests is inexcusable.

We thank the Court for its consideration.

Respectfully submitted,

/s/ Joel B. Rudin

Joel B. Rudin

cc:     All counsel of record (via ECF)